**ORAL ARGUMENT NOT YET SCHEDULED**

No. 22-1056 (consolidated with No. 22-1058)

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

ELECTRIC ENERGY, INC., *et al.*,

*Petitioners,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

*Respondents.*

**On Petition for Review of Final Agency Action of the
United States Environmental Protection Agency**

**JOINT OPENING BRIEF OF PETITIONERS**

Joshua R. More
ARENTFOX SCHIFF LLP
233 S. Wacker Dr.,
Ste. 7100
Chicago, IL 60606
312-258-5500

Helgi C. Walker
David Fotouhi
GIBSON, DUNN &
CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
202-955-8500

P. Stephen Gidiere III
Julia B. Barber
BALCH & BINGHAM LLP
1901 6th Ave. N.,
Ste. 1500
Birmingham, AL 35203
sgidiere@balch.com
205-251-8100

*Counsel for Electric Energy, Inc., Luminant Generation Company LLC, Coleto Creek Power, LLC, Miami Fort Power Company LLC, Zimmer Power Company LLC, Dynegy Midwest Generation, LLC, Illinois Power Generating Company, Illinois Power Resources Generating, LLC, and Kincaid Generation, L.L.C.*

*Additional counsel and parties listed on signature block*

**Dated: December 6, 2022**

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

In accordance with D.C. Circuit Rule 28(a)(1), Petitioners Electric Energy, Inc., Luminant Generation Company LLC, Coleto Creek Power, LLC, Miami Fort Power Company LLC, Zimmer Power Company LLC, Dynegy Midwest Generation, LLC, Illinois Power Generating Company, Illinois Power Resources Generating, LLC, Kincaid Generation, L.L.C., and Utility Solid Waste Activities Group state as follows:

### I.   Parties and *Amici*

### a.  Petitioners:

Petitioners in Case No. 22-1056 are Electric Energy, Inc., Luminant Generation Company LLC, Coleto Creek Power, LLC, Miami Fort Power Company LLC, Zimmer Power Company LLC, Dynegy Midwest Generation, LLC, Illinois Power Generating Company, Illinois Power Resources Generating, LLC, and Kincaid Generation, L.L.C.

Petitioner in Case No. 22-1058 is Utility Solid Waste Activities Group.[1]

### b.  Intervenors and *Amici Curiae*:

Petitioner-Intervenors are the State of Texas and the Texas Commission on Environmental Quality.

---

[1] USWAG members Tennessee Valley Authority and the Edison Electric Institute are not participating in this litigation.

Respondent-Intervenors are Altamaha Riverkeeper, Chattahoochee Riverkeeper, Coosa River Basin, Initiative Comité Diálogo Ambiental, Inc., Hoosier Environmental Council, and Sierra Club.

There are currently no *amici curiae* in these consolidated cases.

### c. Respondents:

Respondents are the United States Environmental Protection Agency (EPA) and Michael S. Regan, EPA Administrator.

## II. Rulings Under Review

Petitioners seek review of the EPA regulations and requirements promulgated on January 11, 2022, through a series of interrelated documents that purport to revise key provisions of EPA's existing rules governing the disposal of coal combustion residuals (CCR), codified at 40 C.F.R. §§257.50-257.107. These documents, which are attached to the Petition for Review (Doc. 1942829 Atts. A-J), include final compliance orders addressed to regulated entities and a State permitting program, as well as proposed denials of specific project closure deadline extensions:

a) EPA News Release, "EPA Takes Key Steps to Protect Groundwater from Coal Ash Contamination" (Jan. 11, 2022);

b) Letter from Carolyn Hoskinson, Director of the Office of Resource Conservation and Recovery, EPA Office of Land and Emergency

Management to Richard E. Dunn, Director, Georgia Environmental Protection Division (Jan. 11, 2022);

c) Letter from Edward Nam, Director of Land, Chemicals and Redevelopment Division, EPA Region 5 to Owen R. Schwartz, Duke Energy (Jan. 11, 2022);

d) Letter from Ariel Iglesias, Director of Land, Chemicals and Redevelopment Division, EPA Region 2 to Jesus Bolinaga, AES Puerto Rico (Jan. 11, 2022);

e) Letter from Wendy Lubbe, Acting Director of Enforcement and Compliance Assurance Division, EPA Region 7 to Jared Morrison, Evergy Kansas Central (Jan. 11, 2022);

f) Letter from Edward Nam, Director of Land, Chemicals and Redevelopment Division, EPA Region 5 to Ronald Froh, Commercial Liability Partners, et al. (Jan. 11, 2022);

g) Proposed Denial of Alternative Closure Deadline for General James M. Gavin Plant, EPA-HQ-OLEM-2021-0590-0002 (Jan. 11, 2022);

h) Proposed Denial of Alternative Closure Deadline for Clifty Creek Power Station, EPA-HQ-OLEM-2021-0587-0023 (Jan 11, 2022);

i) Proposed Denial of Alternative Closure Deadline for Ottumwa Generating Station, EPA-HQ-OLEM-2021-0593-0002 (Jan. 11, 2022); and

j) Proposed Conditional Approval of an Alternative Closure Deadline for H.L. Spurlock Power Station, Maysville, Kentucky, EPA-HQ-OLEM-2021-0595-0002 (Jan. 11, 2022).

## III. Related Cases

Two consolidated cases (Case Nos. 22-1056 and 22-1058) seek review of the agency action challenged here.  Petitioners are unaware of any other related cases.

## <u>CORPORATE DISCLOSURE STATEMENTS</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Electric Energy, Inc., Luminant Generation Company LLC, Coleto Creek Power, LLC, Miami Fort Power Company LLC, Zimmer Power Company LLC, Dynegy Midwest Generation, LLC, Illinois Power Generating Company, Illinois Power Resources Generating, LLC, Kincaid Generation, L.L.C. (collectively "company Petitioners"), and Utility Solid Waste Activities Group ("USWAG") submit the following corporate disclosure statements:

**Electric Energy, Inc.** is a subsidiary of Illinois Power Generating Company, an Illinois corporation, which owns 80% of Electric Energy, Inc.'s common stock. Illinois Power Generating Company in turn is a wholly owned subsidiary of Illinois Power Resources, LLC, a Delaware limited liability company, which in turn is a wholly owned subsidiary of IPH, LLC, a Delaware limited liability company, which in turn is a wholly owned subsidiary of Vistra Operations Company LLC, a Delaware limited liability company, which in turn is a wholly owned subsidiary of Vistra Intermediate Company LLC, a Delaware limited liability company, which in turn is a wholly owned subsidiary of Vistra Corp., a publicly held corporation incorporated under the laws of Delaware. Vistra Corp. is publicly traded on the NYSE under the symbol "VST." To company Petitioners' knowledge, except for Brookfield Asset Management Inc. and The Vanguard Group, Inc., in each case

together with their respective affiliates and managed entities, there are no publicly traded corporations that own more than 10% of Vistra Corp.'s stock.

The remaining 20% of Electric Energy, Inc.'s common stock is owned by Kentucky Utilities Company ("Kentucky Utilities"). Kentucky Utilities is a wholly owned subsidiary of LG&E and KU Energy LLC ("LKE"), a holding company, which in turn is an indirect, wholly owned subsidiary of PPL Corporation. To company Petitioners' knowledge, other than PPL Corporation, no publicly held company owns 10% or more of any LKE membership interest or Kentucky Utilities' shareholding interests. PPL Corporation is a publicly traded corporation under the symbol "PPL." To company Petitioners' knowledge, no publicly held company has a 10% or greater ownership interest in PPL Corporation other than The Vanguard Group, Inc., together with its respective affiliates and managed entities, which reports certain beneficial ownership, for certain purposes, with respect to 11.82% of PPL Corporation shares.

**Luminant Generation Company LLC** and **Coleto Creek Power, LLC** are each wholly owned subsidiaries of Vistra Asset Company LLC, a Delaware limited liability company, which in turn is a wholly owned subsidiary of Vistra Operations Company LLC, a Delaware limited liability company, which in turn is a wholly owned subsidiary of Vistra Intermediate Company LLC, a Delaware limited liability company, which in turn is a wholly owned subsidiary of Vistra Corp., a publicly

held corporation incorporated under the laws of Delaware. Vistra Corp. is publicly traded on the NYSE under the symbol "VST." To company Petitioners' knowledge, except for Brookfield Asset Management Inc. and The Vanguard Group, Inc., in each case together with their respective affiliates and managed entities, there are no publicly traded corporations that own more than 10% of Vistra Corp.'s stock.

**Miami Fort Power Company LLC** and **Zimmer Power Company LLC** are each wholly owned subsidiaries of Luminant Coal Generation LLC, a Delaware limited liability company, which in turn is a wholly owned subsidiary of Luminant Commercial Asset Management LLC, an Ohio limited liability company, which in turn is a wholly owned subsidiary of Vistra Operations Company LLC, a Delaware limited liability company, which in turn is a wholly owned subsidiary of Vistra Intermediate Company LLC, a Delaware limited liability company, which in turn is a wholly owned subsidiary of Vistra Corp., a publicly held corporation incorporated under the laws of Delaware. Vistra Corp. is publicly traded on the NYSE under the symbol "VST." To company Petitioners' knowledge, except for Brookfield Asset Management Inc. and The Vanguard Group, Inc., in each case together with their respective affiliates and managed entities, there are no publicly traded corporations that own more than 10% of Vistra Corp.'s stock.

**Dynegy Midwest Generation, LLC** is a wholly owned subsidiary of Dynegy Coal HoldCo, LLC, a Delaware limited liability company, which in turn is a wholly

owned subsidiary of Vistra Operations Company LLC, a Delaware limited liability company, which in turn is a wholly owned subsidiary of Vistra Intermediate Company LLC, a Delaware limited liability company, which in turn is a wholly owned subsidiary of Vistra Corp., a publicly held corporation incorporated under the laws of Delaware. Vistra Corp. is publicly traded on the NYSE under the symbol "VST." To company Petitioners' knowledge, except for Brookfield Asset Management Inc. and The Vanguard Group, Inc., in each case together with their respective affiliates and managed entities, there are no publicly traded corporations that own more than 10% of Vistra Corp.'s stock.

**Illinois Power Generating Company** and **Illinois Power Resources Generating, LLC** are each wholly owned subsidiaries of Illinois Power Resources, LLC, a Delaware limited liability company, which in turn is a wholly owned subsidiary of IPH, LLC, a Delaware limited liability company, which in turn is a wholly owned subsidiary of Vistra Operations Company LLC, a Delaware limited liability company, which in turn is a wholly owned subsidiary of Vistra Intermediate Company LLC, a Delaware limited liability company, which in turn is a wholly owned subsidiary of Vistra Corp., a publicly held corporation incorporated under the laws of Delaware. Vistra Corp. is publicly traded on the NYSE under the symbol "VST." To company Petitioners' knowledge, except for Brookfield Asset Management Inc. and The Vanguard Group, Inc., in each case together with their

respective affiliates and managed entities, there are no publicly traded corporations that own more than 10% of Vistra Corp.'s stock.

**Kincaid Generation, L.L.C.** is a wholly owned subsidiary of Dynegy Resources Generating HoldCo, LLC, a Delaware limited liability company, which in turn is a wholly owned subsidiary of EquiPower Resources Corp., a Delaware corporation, which in turn is a wholly owned subsidiary of Vistra Operations Company LLC, a Delaware limited liability company, which in turn is a wholly owned subsidiary of Vistra Intermediate Company LLC, a Delaware limited liability company, which in turn is a wholly owned subsidiary of Vistra Corp., a publicly held corporation incorporated under the laws of Delaware. Vistra Corp. is publicly traded on the NYSE under the symbol "VST." To company Petitioners' knowledge, except for Brookfield Asset Management Inc. and The Vanguard Group, Inc., in each case together with their respective affiliates and managed entities, there are no publicly traded corporations that own more than 10% of Vistra Corp.'s stock.

**USWAG** is an association of approximately one hundred and thirty utilities, utility operating companies, and trade associations representing electric companies, utilities, and cooperatives. USWAG represents its members in rulemakings and administrative proceedings before the Environmental Protection Agency under the Resource Conservation and Recovery Act, 42 U.S.C. §6901 *et seq*., and in litigation arising from such proceedings that affect its members. USWAG has no parent

ix

company.  USWAG does not have any outstanding securities in the hands of the public, and no publicly held company has a ten percent or greater ownership interest in USWAG.

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENTS ..........................................v

TABLE OF CONTENTS...........................................................xi

TABLE OF AUTHORITIES ................................................. xiii

GLOSSARY......................................................................... xxii

INTRODUCTION .................................................................1

JURISDICTIONAL STATEMENT ...........................................3

STATEMENT OF ISSUES .......................................................4

STATUTES AND REGULATIONS.............................................4

STATEMENT OF THE CASE...................................................4

I.      Statutory and Regulatory Background ............................................5

II.     EPA's CCR Criteria—The 2015 Rule ...........................................6

        A.      The Proposed Rule ..................................................6

        B.      The Final Rule ........................................................8

                1.      The Scope of the 2015 Rule....................................9

                2.      Location Restrictions ...........................................10

                3.      Groundwater Monitoring and Corrective Action ...................11

                4.      Closure Performance Standards and Post-Closure Care...........11

                5.      EPA's Risk Assessment .......................................16

III.    This Court's Decision in *USWAG* ...............................................17

IV.     The WIIN Act ..................................................................18

V.      The 2020 Part A Rule .........................................................18

VI.     The 2022 Rule..................................................................19

        A.      The January 11 Release........................................19

        B.      Substantive Changes in the 2022 Rule.............................22

       1.    Revisions to Closure Performance Standards ........................... 22

       2.    Expanding the Scope and Coverage of EPA's CCR Criteria ... 23

   C.    EPA's Implementation of the 2022 Rule ............................. 24

SUMMARY OF THE ARGUMENT ................................................... 27

STANDING ......................................................................................... 30

ARGUMENT ....................................................................................... 33

I.    This Court Has Jurisdiction ..................................................... 33

   A.    The 2022 Rule Functionally Amended EPA's Existing CCR
        Criteria ................................................................................ 34

       1.    The New Prohibition on Closure with "Waste Below the
           Water Table" ............................................................... 35

       2.    The 2022 Rule Expands the Scope of EPA's CCR Rules in
           Three Ways ................................................................. 44

   B.    The 2022 Rule Is Final and Otherwise Reviewable ............................ 47

       1.    The 2022 Rule Marks the Consummation of EPA's
           Decision-making Process ............................................ 48

       2.    The 2022 Rule Imposes New Obligations on Regulated
           Parties and States ....................................................... 51

   C.    EPA Treats the 2022 Rule as Binding on Regulated Parties, States,
        and EPA Itself ..................................................................... 54

   D.    Ripeness Poses No Obstacle to This Court's Review ........................ 56

II.   The 2022 Rule Is a Legislative Rule That Did Not Satisfy the Procedural
    Requirements of RCRA or the APA ........................................... 57

III.  The 2022 Rule Is Also Substantively Unlawful ........................... 61

   A.    EPA Has Failed to Provide a Reasoned Explanation for Its Change
        in Position ............................................................................ 61

   B.    EPA Failed to Consider Reliance Interests, and Its Change in
        Position Deprived Petitioners of Fair Notice ...................... 62

IV.  The Proper Remedy Is Vacatur ................................................. 65

CONCLUSION ................................................................................... 67

# TABLE OF AUTHORITIES

**Cases**                                                                                **Page(s)**

*Am. Coal Co. v. Fed. Mine Safety & Health Review Comm'n*,
    796 F.3d 18 (D.C. Cir. 2015).............................................................................41

*AMG Cap. Mgmt., LLC v. FTC*,
    141 S. Ct. 1341 (2021)....................................................................................60

*Am. Mining Congress v. Mine Safety & Health Admin.*,
    995 F.2d 1106 (D.C. Cir. 1993).......................................................................58

*Am. Wild Horse Pres. Campaign v. Perdue*,
    873 F.3d 914 (D.C. Cir. 2017).....................................................................61, 62

*Appalachian Power Co. v. EPA*,
    208 F.3d 1015 (D.C. Cir. 2000)....................... 2, 3, 35, 39, 49, 50, 54, 55, 58, 66

*Ass'n of Battery Recyclers, Inc. v. EPA*,
    208 F.3d 1047 (D.C. Cir. 2000).............................................................33, 35, 66

*Bennett v. Spear*,
    520 U.S. 154 (1997)........................................................................................53

*Brock v. Cathedral Bluffs Shale Oil Co.*,
    796 F.2d 533 (D.C. Cir. 1986).........................................................................60

*Cal. Cmtys. Against Toxics v. EPA*,
    928 F.3d 1041 (D.C. Cir. 2019).......................................................................41

*Cal. Cmtys. Against Toxics v. EPA*,
    934 F.3d 627 (D.C. Cir. 2019).........................................................................49

*Cement Kiln Recycling Coal. v. EPA*,
    493 F.3d 207 (D.C. Cir. 2007)........................................................34, 48, 56, 58, 65

*Chamber of Commerce v. FEC*,
    69 F.3d 600 (D.C. Cir. 1995)...........................................................................32

*Christopher v. SmithKline Beecham Corp.*,
   567 U.S. 142 (2012)................................................................64, 65

*Ciba-Geigy Corp. v. EPA*,
   801 F.2d 430 (D.C. Cir. 1986)...........................................49, 51

*City of Chicago v. Envtl. Def. Fund*,
   511 U.S. 328 (1994).................................................................41

*Clean Air Council v. Pruitt*,
   862 F.3d 1 (D.C. Cir. 2017).....................................................50

*Clean Air Project v. EPA*,
   752 F.3d 999, 1103 (D.C. Cir. 2014)......................................66

*Cmty. Nutrition Inst. v. Young*,
   818 F.2d 943 (D.C. Cir. 1987).................................................58

*CropLife Am. v. EPA*,
   329 F.3d 876 (D.C. Cir. 2003)............................................3, 66

*CSI Aviation Servs., Inc. v. DOT*,
   637 F.3d 408 (D.C. Cir. 2011).................................................53

*DHS v. Regents of Univ. of Cal.*,
   140 S. Ct. 1891 (2020)............................................................63

*Edison Elec. Inst. v. EPA*,
   996 F.2d 326 (D.C. Cir. 1993).................................................56

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016).................................................................63

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009).................................................................64

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012)...........................................................63, 64

xiv

*Gen. Elec. Co. v. EPA*,
    290 F.3d 377 (D.C. Cir. 2002)................................................................51, 54, 57

*Gen. Motors Corp. v. EPA*,
    363 F.3d 442 (D.C. Cir. 2004)..........................................................34, 47, 48, 55

*Heartland Reg'l Med. Ctr. v. Sebelius*,
    566 F.3d 193 (D.C. Cir. 2009)........................................................................65

*Holistic Candlers & Cons. Ass'n v. FDA*,
    664 F.3d 940 (D.C. Cir. 2012)........................................................................31

*Iowa League of Cities v. EPA*,
    711 F.3d 844 (8th Cir. 2013) ........................................................................66

*Ipsen Biopharms., Inc. v. Azar*,
    943 F.3d 953 (D.C. Cir. 2019)..................................................................50, 53

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019)..............................................................................39, 64

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994)......................................................................................62

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)......................................................................................31

*McLouth Steel Prods. Corp. v. Thomas*,
    838 F.2d 1317 (D.C. Cir. 1988)....................................................................59

*Molycorp, Inc. v. EPA*,
    197 F.3d 543 (D.C. Cir. 1999)................................................................47, 56

*Morton v. Ruiz*,
    415 U.S. 199 (1974)......................................................................................60

*Nat'l Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014)............................................................55, 57, 61

*Newman v. FERC*,
    27 F.4th 690 (D.C. Cir. 2022)...............................................................39

*NRDC v. Wheeler*,
    955 F.3d 68 (D.C. Cir. 2020)....................................35, 51, 65, 66

*Parker v. District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007).........................................................30

*PHH Corp. v. CFPB*,
    839 F.3d 1 (D.C. Cir. 2016).............................................................62

*Physicians for Soc. Responsibility v. Wheeler*,
    956 F.3d 634 (D.C. Cir. 2020).........................................................61

*POET Biorefining, LLC v. EPA*,
    970 F.3d 392 (D.C. Cir. 2020)........................... 48, 51, 52, 55, 57, 61

*Sackett v. EPA*,
    566 U.S. 120 (2012)........................................................................53

*Satellite Broad. Co. v. FCC*,
    824 F.2d 1 (D.C. Cir. 1987).......................................................62, 63

*Scenic, Inc. v. DOT*,
    836 F.3d 42 (D.C. Cir. 2016)..........................................................31

*Shell Oil Co. v. EPA*,
    950 F.2d 741 (D.C. Cir. 1991)........................................................59

*Sierra Club v. EPA*,
    292 F.3d 895 (D.C. Cir. 2002).......................................................30

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    578 U.S. 590 (2016)..................................................................50, 52

*USWAG v. EPA*,
    901 F.3d 414 (D.C. Cir. 2018)........................................... 4-6, 17, 18

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022)............................................................................28, 30

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001)...................................................................................61

## **Federal Statutes**

5 U.S.C. §551(4) .......................................................................................35

5 U.S.C. §551(13) .....................................................................................35

5 U.S.C. §553 ...........................................................................................30

5 U.S.C. §553(b) .......................................................................................59

42 U.S.C. §6903(3) ...................................................................................46

42 U.S.C. §6903(14) ...................................................................................6

42 U.S.C. §6903(26) ...................................................................................6

42 U.S.C. §6907(a) ..........................................................................6, 30, 57

42 U.S.C. §6907(a)(3) .................................................................................5

42 U.S.C. §6911(a) ...................................................................................48

42 U.S.C. §6928(a) ...............................................................................6, 33

42 U.S.C. §6928(a)(3) ...............................................................................53

42 U.S.C. §6928(c) ...............................................................................6, 33

42 U.S.C. §6928(g) ...........................................................................6, 33, 53

42 U.S.C. §6944(a) .......................................................................6, 30, 57, 60

42 U.S.C. §6945(a) ...............................................................................6, 33

42 U.S.C. §6945(d) ................................................................5, 54

42 U.S.C. §6945(d)(1) ...............................................................66

42 U.S.C. §6945(d)(1)(A) ...........................................................18

42 U.S.C. §6945(d)(2)(B) ...........................................................66

42 U.S.C. §6945(d)(4)(A) .................................................6, 33, 66

42 U.S.C. §6945(d)(4)(B) .......................................................18, 66

42 U.S.C. §6972(a) .................................................................6, 33

42 U.S.C. §6974(b)(1) .......................................................6, 30, 57

42 U.S.C. §6976(a)(1) ...............................................3, 28, 33, 34, 47

## Federal Regulations

40 C.F.R. §1.47 ......................................................................48

40 C.F.R. §257.50 ...............................................................10, 22

40 C.F.R. §257.50(b) .................................................................9

40 C.F.R. §257.50(c) .................................................................9

40 C.F.R. §257.50(g) .........................................................18, 24, 46

40 C.F.R. §257.53 .................................9, 11, 18, 22, 23, 32, 42, 43, 45-47

40 C.F.R. §§257.60-.64 ...............................................................10

40 C.F.R. §257.60(a) ............................................................10, 17

40 C.F.R. §257.60(c)(1) .............................................................64

40 C.F.R §§257.90-.98 ...............................................................11

40 C.F.R. §257.90(b) ....................................................................64

40 C.F.R. §257.90(e) ....................................................................64

40 C.F.R. §257.97(b) ....................................................................11

40 C.F.R. §257.101(a)(1) ..............................................................18

40 C.F.R. §257.101(b)(1)(i) ....................................................35, 37

40 C.F.R. §257.101(b)(1)(ii) .........................................................37

40 C.F.R. §257.102 .................................................................22, 36

40 C.F.R. §257.102(a) ..................................................................12

40 C.F.R. §257.102(b)(1)(iii) ..................................................13, 38

40 C.F.R. §257.102(b)(2)(i) ..........................................................64

40 C.F.R. §257.102(d) ............................................................17, 37

40 C.F.R. §257.102(d)(1)(i) ........................................12, 13, 38, 39

40 C.F.R. §257.102(d)(2) .........................................................12, 43

40 C.F.R. §257.102(d)(3) ..............................................................13

40 C.F.R. §257.102(d)(3)(i)(B) .....................................................13

40 C.F.R. §257.102(d)(3)(i)(C) .....................................................13

40 C.F.R. §257.102(f)(3) ...............................................................42

40 C.F.R. §257.103(a) ..................................................................18

40 C.F.R. §257.103(f)(1)(iii) .........................................................19

40 C.F.R. §257.103(f)(2)(iii) .........................................................19

40 C.F.R. §257.103(f)(3)(i) ........................................................19

40 C.F.R. §257.104 ..................................................................39

40 C.F.R. §257.104(c) ..............................................................11

**Federal Register**

75 Fed. Reg. 35,128 (June 21, 2010) .................................. 6-8, 14, 36, 40

80 Fed. Reg. 21,301 (Apr. 17, 2015) .............................. 8-14, 36, 38, 40, 42, 45, 46

85 Fed. Reg. 53,516 (Aug. 28, 2020) ..........................................18, 19, 60

87 Fed. Reg. 1,676 (Jan. 12, 2022) ...............................................53

87 Fed. Reg. 72,989 (Nov. 28, 2022) ............................................27

**Miscellaneous**

*Duke Energy*, 2021 OEA 25, 2021 WL 2301805 (Ind. Dep't of Envtl. Mgmt. May 4, 2021) ......................................................................43

Edwards Power Station Closure Plan (Oct. 17, 2016) ...........................31

EPA, *Closure of Hazardous Waste Surface Impoundments* (Sept. 1982) .........14, 15

EPA, *Comment Summary and Response Document, Vol. 9* (Dec. 2014) ...............37

EPA, *Comment Summary and Response Document, Vol. 10* (Dec. 2014) ..............44

EPA, *EPA Takes Final Action to Protect Groundwater from Coal Ash Contamination at Ohio Facility* (Nov. 18, 2022) ..............................................27, 50

EPA, *Final Decision: Denial of Alternative Closure Deadline for General James M. Gavin Plant*, EPA-HQ-OLEM-2021-0590-0100 (Nov. 18, 2022) ...................................................................27, 49

EPA, *Guide for Industrial Waste Management* (Feb. 2003) ......................14, 15, 40

EPA, *Human and Ecological Risk Assessment of Coal Combustion Residuals* (Dec. 2014) .................................................................4, 5, 14, 16, 39, 43

EPA, *Regulatory Impact Analysis* (Dec. 2014) ......................................................12

*In re Pub. Serv. Co. of Colorado, Comanche Station*, Docket No. RCRA-08-2022-0008, 2022 WL 1688366 (EPA Region 8 May 20, 2022) ........................53

# **GLOSSARY**

| | |
|---|---|
| **APA** | Administrative Procedure Act |
| **CCR** | Coal combustion residuals |
| **EPA** | U.S. Environmental Protection Agency |
| **RCRA** | Resource Conservation and Recovery Act of 1976, 42 U.S.C. §6901 *et seq*. |
| **USWAG** | Utility Solid Waste Activities Group |
| **WBWT** | Waste below the water table |
| **WIIN ACT** | Water Infrastructure Improvements for the Nation Act, Pub. L. No. 114-322, 130 Stat. 1628 (2016), codified at 42 U.S.C. §6945(d) |

## INTRODUCTION

This case involves EPA criteria governing coal combustion residuals—commonly called "CCR"—which is a type of waste generated at coal-fueled power plants and managed in impoundments and landfills (collectively, "CCR units"). In 2015, EPA promulgated criteria under the Resource Conservation and Recovery Act ("RCRA") governing the disposal of CCR and requiring some CCR units to close, either by (1) removing CCR and transporting it to a new disposal site or (2) closing a unit with CCR in place, draining the water from the unit, and constructing a cover system to prevent infiltration of water from the surface. For years, the energy industry has worked closely with EPA and the States to reconfigure physical infrastructure and operations and prepare closure plans that comply with these criteria without disrupting the nation's power supply.

But on January 11, 2022, without prior notice and comment, and without acknowledging its abrupt change in position, EPA announced new CCR requirements that threaten to impose severe burdens and penalties on companies that relied on the existing criteria. The primary merits issue in this appeal is whether those new requirements were a legislative rule promulgated in violation of RCRA and the Administrative Procedure Act ("APA").

EPA boasted of the new requirements in a press release announcing that the agency was taking new "actions to protect communities and hold facilities

1

accountable for controlling and cleaning up the contamination created by decades of coal ash disposal." JA__[Doc. 1942829, Att. A]. The same day, EPA issued a series of coordinated "proposed" decisions denying requests for extensions of regulatory closure deadlines and, in discrete sections of those "proposals," elaborated on the new CCR requirements in more detail. EPA simultaneously issued correspondence to a State agency and regulated companies directing them to comply with the new requirements and cross-referencing the relevant sections of EPA's "proposed" decisions. In the ensuing months, EPA continued (and still continues) to implement the requirements announced on January 11.

EPA's main defense of the new requirements is that they are not new at all, and that in any event they are unreviewable. But "[t]he phenomenon [the Court] see[s] in this case is familiar." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1020 (D.C. Cir. 2000). When an agency attempts to impose new obligations through informal or otherwise purportedly non-final documents, the agency *always* invokes the same swarm of supposed jurisdictional and merits obstacles that EPA intends to raise here. *See* Doc. 1969417 at 6 (invoking standing, finality, ripeness, and related arguments). Of course, that is the point—one of the reasons an agency forgoes notice-and-comment rulemaking is the hope of "immunizing its lawmaking from judicial review." *Appalachian Power*, 208 F.3d at 1020. But where, as here, an agency purports to change the law in a manner that "is for all practical purposes

2

'binding'" on regulated parties, *id.* at 1021, the agency's creativity cannot prevent

petitioners from having their day in court. *See CropLife Am. v. EPA*, 329 F.3d 876,

881 (D.C. Cir. 2003) (vacating EPA directive in press release).

With EPA's jurisdictional minefield out of the way, the agency has no serious

defense on the merits. RCRA and the APA require EPA to promulgate legislative

rules like the criteria announced on January 11, 2022, through the ordinary notice-

and-comment process, among other procedural prerequisites, and well-settled

principles of administrative law require agencies to explain a change in position and

consider reliance interests before moving forward. EPA did none of that here.

The Court should grant the petitions for review and vacate EPA's new CCR

requirements.

## JURISDICTIONAL STATEMENT

This Court has subject-matter jurisdiction under 42 U.S.C. §6976(a)(1). The

petitions for review challenge final regulations and requirements that EPA

announced in a series of interrelated documents released on January 11, 2022. Doc.

1942829, Atts. A-J. These new regulations and requirements purport to apply to the

company Petitioners' and USWAG members' facilities and would impose

significant costs and subject them to severe sanctions for noncompliance. *Infra* at

30-33 (discussing Petitioners' standing). Petitioners filed timely petitions for review

on April 8, 2022. Docs. 1942829, 1942595; 42 U.S.C. §6976(a)(1).

3

## STATEMENT OF ISSUES

1.      Whether this Court has jurisdiction to review regulatory requirements EPA announced in a coordinated series of documents released on January 11, 2022.

2.      Whether EPA's adoption of the requirements failed to comply with statutory procedural prerequisites, including that CCR criteria must be promulgated through notice-and-comment rulemaking.

3.      Whether the new requirements are arbitrary and capricious.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are included in the addendum.

## STATEMENT OF THE CASE

This case is about the closure of CCR landfills and impoundments.  For decades, coal-fueled power plants have lawfully disposed of CCR "in dry landfills or by mixing it with water to channel it" away from the power plant "to wet surface impoundments," which store CCR in water.  *USWAG v. EPA*, 901 F.3d 414, 421 (D.C. Cir. 2018).  In an operating CCR impoundment, the water in the impoundment creates downward pressure (called hydraulic head) that can force contaminants into surrounding groundwater.  JA__-__[EPA, *Human and Ecological Risk Assessment of Coal Combustion Residuals* 5-28 to 5-29 (Dec. 2014) ("Risk Assessment")].  However, as EPA recognized in 2015, when an impoundment is closed by draining the water and installing a final cover system to minimize water infiltration, the hydraulic head is eliminated, and the risks of groundwater contamination "drop

4

dramatically" to be "negligible" as compared to impoundments that are closed by removing the CCR and disposing of it elsewhere. *Id*.

## I.    Statutory and Regulatory Background

RCRA provides the statutory framework for the regulation of solid waste. Subtitle D provides for collaborative federal and State regulation of solid non-hazardous waste, while Subtitle C governs hazardous waste under a more stringent federal scheme. EPA regulates CCR as non-hazardous solid waste under the less stringent Subtitle D criteria.

"EPA's principal role under Subtitle D is to announce federal guidelines for state management of nonhazardous wastes[.]" *USWAG*, 901 F.3d at 423. EPA's guidelines "provide minimum criteria to be used by the States to define those solid waste management practices which constitute the [prohibited] open dumping of solid waste[.]" 42 U.S.C. §6907(a)(3). EPA promulgates the criteria, but States "are primarily responsible for regulating disposal of nonhazardous wastes[.]" *USWAG*, 901 F.3d at 423. With respect to CCR, States may undertake this role through regulatory programs that, once approved by EPA, operate "in lieu of" EPA's criteria. 42 U.S.C. §6945(d). Where States do not, EPA can enforce the criteria, which remain self-implementing until EPA establishes its own permit program (which it has not). *Id*.

EPA's criteria create the dividing line between a "sanitary landfill" (which RCRA allows) and an "open dump" (which RCRA prohibits). *USWAG*, 901 F.3d at 420; *see also* 42 U.S.C. §§6903(14), (26). Any person "engaged in the act of open dumping" is subject to sanctions, 42 U.S.C. §6945(a), (d)(4)(A), including EPA or citizen enforcement actions for injunctive relief and civil penalties, *id.* §§6928(a), (c), (g), 6972(a). EPA's criteria "may provide for the classification of" different "types of sanitary landfills." *Id.* §6944(a).

Congress requires EPA to follow the procedural requirements of the APA and additional statutory procedures in RCRA before promulgating new criteria. New Subtitle D criteria must be "promulgate[d] [as] regulations" "after consultation with the States, and after notice and public hearings." *Id.*; *see also id.* §§6907(a), 6974(b)(1).

## II.    EPA's CCR Criteria—The 2015 Rule

### A.    The Proposed Rule

In 2010, EPA proposed the first RCRA regulations focused exclusively on CCR. 75 Fed. Reg. 35,128 (June 21, 2010). EPA proposed to regulate CCR either as a hazardous waste under Subtitle C or through CCR-specific non-hazardous waste regulations under Subtitle D. *Id.*

Under both options, EPA proposed to ban disposal of CCR below the "natural water table" through a "location restriction." *Id.* at 35,198-99. As proposed, existing

6

surface impoundments located less than two feet above "the upper limit of the natural water table" would be required to close.  *Id*. at 35,241.  EPA proposed to define "natural water table" to mean "the natural level at which water stands in a shallow well open along its length and penetrating the surficial deposits just deeply enough to encounter standing water at the bottom."  *Id.*

Under both proposed alternatives (*i.e.*, the Subtitle C and Subtitle D options), certain surface impoundments (including those that triggered the "natural water table" provision) were required to cease receiving CCR and begin a closure process. Both alternatives allowed for closure either by: (1) leaving the CCR in the impoundment, making certain structural improvements, and installing a cover system—*i.e.*, closure-in-place; or (2) physically removing the CCR from the impoundment to be disposed of elsewhere—*i.e.*, closure-by-removal, which EPA sometimes calls "clean closure."  *Id*. at 35,252, 35,257.

The proposed Subtitle D rule included performance standards for the closure-in-place option.  *Id*. at 35,208-09, 35,252.  Among these, "[a]t closure" the "operator of a surface impoundment must" "[e]liminate free liquids by removing liquid wastes or solidifying the remaining wastes and waste residues."  *Id*. at 35,252.  Under this requirement, "[a]t closure, the owner or operator of a surface impoundment would be required to either drain the unit, or solidify the remaining wastes."  *Id*. at 35,208. Further, the operator must "[c]over the surface impoundment with a final cover

7

designed and constructed to," among other things, "[p]rovide long-term minimization of the migration of liquids through the closed impoundment." *Id*. at 35,252.

EPA's Subtitle D proposal did not restrict the categories of units that could select the closure-in-place option. EPA explained that it intended "to allow some flexibility in the self-implementing scheme for facilities in their closure options, while providing protection for health and the environment under either option." *Id.* at 35,208. EPA "anticipate[d] that facilities w[ould] mostly likely *not* clean close their units, given the expense and difficulty of such an operation." *Id.* (emphasis added). And although the proposed rule discussed the requirements for closure-in-place extensively, nowhere did EPA state that facilities could not close with CCR in contact with groundwater or below the water table.

**B.    The Final Rule**

In 2015, EPA rejected the option of regulating CCR as hazardous waste under Subtitle C and instead determined to regulate CCR as non-hazardous solid waste under the less stringent Subtitle D criteria. *See* 80 Fed. Reg. at 21,301. Petitioners refer to these criteria, which are codified at 40 C.F.R. Part 257, Subpart D, as the "2015 Rule."

Consistent with RCRA's statutory framework at the time, the criteria are self-implementing standards "that owners or operators of regulated units can implement

without any interaction with regulatory officials." *Id*. at 21,330. To that end, the regulations set forth "sufficiently objective and technically precise" requirements to enable implementation by regulated parties and their professional engineers. *Id*. at 21,335.

### 1.    The Scope of the 2015 Rule

The final criteria apply to "new and existing landfills and surface impoundments … that dispose or otherwise engage in solid waste management of CCR generated from the combustion of coal at electric utilities and independent power producers." 40 C.F.R. §257.50(b). EPA defined "CCR surface impoundments" as "a natural topographic depression, man-made excavation, or diked area, which is designed to hold an accumulation of CCR and liquids, and the unit treats, stores, or disposes of CCR." *Id.* §257.53.

Regulated CCR surface impoundments include "inactive CCR surface impoundments"—*i.e.*, units that remained open but did not receive CCR after the 2015 Rule's effective date. *Id*. §257.50(c). But the 2015 Rule does not require "closed" surface impoundments to "reclose." 80 Fed. Reg. at 21,343. Thus, impoundments that, as of the effective date, were "capped or otherwise maintained" and "no longer contain[ed] water and [could] no longer impound liquid" are not required to meet the criteria. *Id*.

The 2015 Rule does not apply to, among other things, storage of CCR in tanks or "practices that meet the definition of a beneficial use of CCR." 40 C.F.R. §257.50. Beneficial use includes, for example, the use of CCR for roadbed to replace "quarried aggregate or other industrial materials" or as an ingredient in concrete. 80 Fed. Reg. at 21,347.

### 2.    Location Restrictions

The 2015 Rule contains five "location restrictions" for CCR units "[t]o ensure there will be no reasonable probability of adverse effects on health or the environment[.]" *Id*. at 21,304 (codified at 40 C.F.R. §§257.60-.64). The location restrictions relate to "placement of CCR above the uppermost aquifer, in wetlands, within fault areas, in seismic impacts zones, and in unstable areas." *Id*. Existing CCR units that cannot satisfy the location restrictions must close. *Id*.

The final criteria did not prohibit continued operation of CCR units in contact with groundwater. EPA *rejected* the proposed prohibition on placement of CCR within two feet of the "natural water table" in favor of a restriction on the placement of CCR within five feet of the "uppermost aquifer." *Id.* at 21,361-62; 40 C.F.R. §257.60(a). EPA explained that this change was necessary given fluctuations in the natural water table that make it "difficult to determine." 80 Fed. Reg. at 21,362. The 2015 Rule defines "aquifer" as "a geologic formation, group of formations, or portion of a formation capable of yielding usable quantities of groundwater to wells

10

or springs" and "uppermost aquifer" as "the geologic formation nearest the natural ground surface that is an aquifer, as well as lower aquifers that are hydraulically interconnected with this aquifer within the facility's property boundary." 40 C.F.R. §257.53. EPA eliminated the defined term "natural water table" and separately defined "groundwater" as "water below the land surface in a zone of saturation." *Id*. Thus, under the criteria, not all "groundwater" is an "aquifer," and the presence of groundwater does not determine whether the location restriction in Section 257.60(a) is triggered and a unit must close.

### 3.    Groundwater Monitoring and Corrective Action

The 2015 Rule includes requirements to monitor groundwater and conduct corrective action when contaminants are detected above certain defined levels. *See id*. §§257.90-98. Corrective action requires, among other things, controlling the source of contaminant releases and remediation of impacted groundwater. *Id*. §257.97(b). These requirements to address groundwater contamination apply "during the closure and post-closure care period." 80 Fed. Reg. at 21,399. For units closed with CCR in place, the post-closure care period extends for a minimum of thirty years. 40 C.F.R. §257.104(c).

### 4.    Closure Performance Standards and Post-Closure Care

As in the proposal, the 2015 Rule allows units to close "*either* by leaving the CCR in place and installing a final cover system *or* through removal of the CCR and

11

decontamination of the CCR unit." *Id*. §257.102(a) (emphases added). The rule does not "require clean closure nor [] establish restrictions on the situations in which clean closure would be appropriate," but instead "allows the owner or operator to determine whether clean closure or closure with the waste in place is appropriate for their particular unit." 80 Fed. Reg. at 21,412. EPA's Regulatory Impact Analysis assumed that all existing CCR units would be closed in place. *See id*. at 21,459; JA__[EPA, *Regulatory Impact Analysis* 4-28 (Dec. 2014)].

"EPA received no significant comments on the proposed performance standards" for the closure-in-place option and "therefore finaliz[ed] these requirements without revision from the proposal (although EPA has reorganized the final regulatory text for greater clarity)." 80 Fed. Reg. at 21,414. Accordingly, as proposed, "[f]ree liquids must be eliminated by removing liquid wastes or solidifying the remaining wastes and waste residues" "sufficient to support the final cover system." 40 C.F.R §257.102(d)(2). And, post-closure, "[t]he final rule requires that *any final cover system* control, minimize or eliminate, to the maximum extent practicable, post-closure infiltration of liquids into the waste and releases of leachate (in addition to CCR or contaminated run-off) to the ground or surface waters." 80 Fed. Reg. at 21,413 (emphasis added) (referencing regulatory language in 40 C.F.R. §257.102(d)(1)(i)).

EPA repeatedly explained that the closure-in-place performance standard that addressed post-closure "infiltration of liquids" and "releases of leachate" is directed at the final cover system, which must be "designed to minimize infiltration and erosion." 40 C.F.R. §257.102(d)(1)(i), (d)(3); *see also id.* §257.102(b)(1)(iii) ("The closure plan must also discuss how the final cover system will achieve the performance standards specified in paragraph (d) of this section."); 80 Fed. Reg. at 21,413 ("final cover system" must "minimize" "infiltration" and "releases of leachate"); *id.* at 21,414 (linking performance standard in 40 C.F.R. §257.102(d)(1)(i) to final cover system "[a]s discussed in the previous section"). To this end, "[t]he *infiltration* of liquids through the closed CCR unit must be minimized *by the use of an infiltration layer* that contains a minimum of 18 inches of earthen material" and "erosion ... must be minimized by the use of an erosion layer that contains a minimum of six inches of earthen material that is capable of sustaining native plant growth." 40 C.F.R. §257.102(d)(3)(i)(B)&(C) (emphases added).

The twin requirements to "eliminate[]" "free liquids" and "[c]ontrol, minimize, or eliminate" "infiltration" are intended to reduce the "hydraulic head" in a closed impoundment, meaning the pressure that is exerted by the ponded water in an open surface impoundment. 80 Fed. Reg. at 21,328. The pressure caused by the "hydraulic head" "promotes more rapid leaching of contaminants" into groundwater. *Id.* As EPA explained:

> During operation, free liquids that are ponded in the impoundment create a strong hydraulic head that acts to increase infiltration through the base of the impoundment. The removal of free liquids and capping during closure reduces the hydraulic head and the rate of contaminant migration. After closure is complete, infiltration through the impoundments is driven only by percolation of incident precipitation through the cap.

JA__[Risk Assessment at K-1]; *see also* 80 Fed. Reg. at 21,342 ("[M]uch of the risk from [surface impoundments] is driven by the hydraulic head imposed by impounded units."); 75 Fed. Reg. at 35,207 ("Closure requirements, such as placing the cover system on the disposal unit, ensure that rainfall is diverted from the landfill or surface impoundment, minimizing any leaching that might occur based on the hydraulic head placed on the material in the unit.").

The final closure performance standards were modeled after various sources, including EPA's guidance for industrial waste management and elements of the regulations for interim-status hazardous waste units. 80 Fed. Reg. at 21,409 & n.119, 21,413. Under both, the term "infiltration" is used to describe the performance of the final cover system and the "downward migration" of liquids "through the cover soil" of the closed impoundment. *See* JA__[EPA, *Closure of Hazardous Waste Surface Impoundments* 26 (Sept. 1982) ("1982 Guidance")]; *see also* EPA, *Guide for Industrial Waste Management* 11-1 (Feb. 2003), https://tinyurl.com/yp3te6wc ("2003 Guidance") ("For post-closure care, the overall

14

goal is to minimize the infiltration of water into a unit by providing maintenance of the final cover.").

To illustrate this point, EPA's 1982 Guidance shows a closed impoundment with waste in contact with groundwater and below the water table and depicts the concept of "infiltration" as the *vertical flow* of precipitation and runoff *through the cover system*—in contrast to lateral "ground water underflow":



Figure 3-1. Simplified Water Balance for Filled Surface Impoundment

JA__[1982 Guidance at 25]. That guidance further explains that the requirement to remove "free liquids" prior to installing the cover seeks to "yield consolidated wastes of sufficient density to support the cover and associated construction vehicles," consistent with Section 257.102(d)(2). JA__[*Id.* at 9]; 2003 Guidance at 11-7.

15

5.    EPA's Risk Assessment

The closure options in the 2015 Rule were examined by EPA in a contemporaneous risk assessment to "provide a scientific basis for the development of regulations necessary to protect human health and the environment[.]" JA__[Risk Assessment at ES-1]. For the closure requirements, EPA's Risk Assessment considered "the potential impact of postclosure releases through a sensitivity analysis," JA__[*id.* at 5-28], and it did so assuming that many CCR impoundments "come in direct contact with the water table," JA__[*id*. at 5-10]. Consistent with the performance standard, the Risk Assessment modeled a "postclosure period, when all free liquid remaining in the impoundment is removed, leaving behind [CCR] sludges and sediments that are capped with an appropriate final cover," thus "reduc[ing] the hydraulic head and the rate of contaminant migration." JA__[*Id*. at K-1].

Using these assumptions, EPA's analysis "show[ed] that releases from surface impoundments drop dramatically after closure, even with waste in place." JA__-__[*Id.* at 5-28 to 5-29]. "This is because the large hydraulic head present during operation forces leachate into the underlying soils at a faster rate, resulting in higher releases to ground water than can occur postclosure." JA__[*Id*. at 5-29] "Based on these findings, EPA concluded that the assumption of clean closure has a negligible effect on modeled risks" as compared to closure-in-place. *Id.*

16

### III.  This Court's Decision in *USWAG*

In *USWAG*, this Court reviewed and largely approved, with exceptions detailed below, the 2015 Rule.  Both environmental and industry organizations petitioned for review.  The challenges focused primarily on whether certain CCR units were permitted *to continue operating* (*e.g.*, receiving CCR for disposal), not what operators must do with impoundments when they close.  *See USWAG*, 901 F.3d at 420 ("Each claim here relates to what a utility … must do to qualify [a CCR] site as a sanitary landfill that may lawfully operate under RCRA.").

Environmental organizations challenged the 2015 Rule's provision allowing unlined surface impoundments to continue receiving CCR unless it was determined that an impoundment was leaking.  *Id.* at 427.  This Court held that the regulations were unlawful to the extent they allowed "continued leakage" from operating unlined impoundments "during the years before leakage is ultimately halted by retrofit or closure."  *Id*. at 429.  The Court did not hold that an impoundment cannot close with CCR in contact with groundwater.  Instead, the Court addressed *when* a CCR unit must close, not *how* it must close.  *Id*. at 447 ("Thus, if a disposal site is classified as an open dump, it must either retrofit or close.  The Final Rule stays true to the statutory mandate." (citation omitted)).

No party challenged the location restriction in 40 C.F.R. §257.60(a); the closure-in-place option and performance standards in §257.102(d) for facilities that

17

are required to close; the exclusion for beneficial use in §257.50(g); or the definitions of "free liquids" or "CCR surface impoundment" in §257.53.

## IV.    The WIIN Act

In December 2016, the Water Infrastructure Improvements for the Nation Act ("WIIN Act") "amended RCRA Subtitle D to allow the EPA to approve State permitting programs 'to operate in lieu of [EPA] regulation of coal combustion residuals units in the state,' provided those programs are at least as environmentally protective as the existing (or successor) EPA regulations." *USWAG*, 901 F.3d at 426 (quoting 42 U.S.C. §6945(d)(1)(A)).  The amendments also authorize EPA to take enforcement action, even in an approved State, "to ensure that the [CCR] unit is operating in accordance with the criteria established under the permit program or other system of prior approval[.]"  42 U.S.C. §6945(d)(4)(B).  To date, EPA has approved State programs in Oklahoma, Georgia, and Texas.

## V.    The 2020 Part A Rule

In response to *USWAG*, EPA promulgated amendments to the 2015 Rule, known as the "Part A" revisions.  85 Fed. Reg. 53,516 (Aug. 28, 2020).  As relevant here, EPA set the deadline by which unlined surface impoundments must cease receiving CCR and initiate closure, along with new provisions allowing facilities to seek temporary extensions of the deadline if they lack "alternative disposal capacity."  40 C.F.R. §§257.101(a)(1), 257.103(a).

18

To obtain an extension, applicants must demonstrate that, among other things, the facility "is in compliance with all of the requirements of this subpart." *Id*. §257.103(f)(1)(iii), (f)(2)(iii). Before granting an extension, EPA voluntarily posts its proposed approval or denial on the agency's website for limited public comment, but "[t]his process is not a rulemaking" that is intended to satisfy the procedural requirements for promulgating new RCRA criteria. *See* 85 Fed. Reg. at 53,552.

Applications for extensions were due by November 30, 2020. 40 C.F.R. §257.103(f)(3)(i). Dozens of companies, including many of the company Petitioners and USWAG members, submitted Part A applications seeking an extension of the deadline to cease operating and initiate closure. SA-2.[2]

## VI.   The 2022 Rule

### A.   The January 11 Release

This case involves a series of interrelated documents that EPA released on January 11, 2022, which Petitioners contend set forth new CCR criteria. EPA announced the new criteria in a press release, official correspondence, and proposed denials of companies' Part A applications. JA__-__[Doc. 1942829, Atts. A-J]. For simplicity, Petitioners refer to the requirements announced on January 11 collectively as "the 2022 Rule."

---

[2] Pursuant to Circuit Rule 28(a)(7), Petitioners have provided evidence of their standing in a separate addendum, cited as SA-#.

The press release announced that EPA was taking "Key Steps to Protect Groundwater from Coal Ash Contamination." JA__[*Id.* at 9]. EPA described several actions to "hold facilities accountable for controlling and cleaning up the contamination created by decades of coal ash disposal." *Id.* "Today's actions," EPA said, would "advance the agency's commitment to protecting groundwater," including by: (1) "proposing decisions on requests for extensions to the current deadline for initiating closure"; (2) "putting several facilities on notice regarding their obligations to comply with CCR regulations"; and (3) "laying out plans for future regulatory actions to ensure coal ash impoundments meet strong environmental and safety standards." JA__-__[*Id.* at 9-10].

Simultaneously, EPA issued three proposed denials and one proposed conditional approval of companies' requests for Part A extensions. In the proposed denials, EPA determined that the facilities were in "violation of 40 C.F.R. §257.102(b)" because their closure plans did not account for the new requirements announced that day. JA__,__,__[*Id.* at 91, 174, 256]. "In addition," EPA asserted, "the proposed determinations re-state[d] EPA's consistently held position that surface impoundments or landfills cannot be closed with coal ash in contact with groundwater." JA__[*Id.* at 11].

The same day, EPA directed the Georgia Environmental Protection Division, which administers Georgia's federally-approved CCR permit program, to review

EPA's new "explanation" "regarding the closure performance standards at 40 [C.F.R.] §257.102(d)." JA__[*Id.* at 16]. EPA's letter requested that the Georgia agency review whether the State's "CCR permits … are consistent with the federally approved Georgia CCR Permit Program." *Id.* EPA did not, however, point to the text of the existing regulations. Instead, EPA referred the Georgia agency to "Section III.E.1" of one of EPA's January 11 "proposed decision[s]" denying a company's application for an extension. *Id.* EPA directed the Georgia agency to "review its pending and issued CCR permits to determine whether the permits are consistent with" EPA's new "explanation" of the closure requirements "and whether [the permits] need to be modified or reissued" in light of the "closure discussion provided in the proposed action for Gavin Power LLC[.]" *Id.*

Finally, and also on January 11, EPA issued a series of letters informing various companies of the new requirements. One letter informed Duke Energy that two of its impoundments, although drained of impounded water and covered with soil and grass since 1989, would now be considered a "CCR surface impoundment … where liquid remains in the unit because the base of the unit intersects with groundwater." JA__[*Id.* at 19]. Similarly, EPA informed AES Puerto Rico that EPA might consider the company's closure plan to be out of compliance under the new requirements. JA__-__[*Id.* at 24-28]. EPA sent substantially similar

letters to Evergy Kansas Central, Inc., JA__-__[*id.* at 30-39], and Commercial Liability Partners, LLC, JA__-__[*id.* at 41-42].

### B.    Substantive Changes in the 2022 Rule

Substantively, the 2022 Rule changes at least two key components of the existing regulations to more stringent criteria: (1) the closure options and performance standards in 40 C.F.R. §257.102; and (2) the scope and coverage of the CCR regulations as set forth in 40 C.F.R. §257.50 and §257.53.

### 1.    Revisions to Closure Performance Standards

EPA announced a new classification of closing CCR units—namely, "surface impoundments or landfills … with coal ash in contact with groundwater"—and announced for the first time that these units may only utilize the closure-by-removal option.  JA__[Doc. 1942829 at 11].  EPA now purports to prohibit such units from utilizing the closure-in-place option in Section 257.102(d).  *Id.* ("[S]urface impoundments or landfills cannot be closed with coal ash in contact with groundwater.").  EPA describes the new requirement as a prohibition against "waste below the water table" or "WBWT."  JA__[Doc. 1967068 at 10].

In an attempt to link the new "waste below the water table" prohibition to the text of the existing regulations, EPA announced new definitions of the key terms "infiltration" and "free liquids" and an expansion of the performance standards in Section 257.102(d).  The 2022 Rule defines "infiltration" to mean "*any liquid*

passing into or through the CCR unit by filtering or permeating *from any direction*, including the top, *sides, and bottom of the unit*." JA__[Doc. 1942829 at 90] (emphases added). And EPA redefined "free liquids" to mean "the free-standing liquid in the impoundment and [] all separable porewater in the impoundment, whether the porewater was derived from sluiced water"—meaning the water that transports CCR from a power plant to an impoundment—"or groundwater that intersects the impoundment." JA__[*Id*. at 21]. EPA further revised the requirement in Section 257.102(d)(2)(i) & (ii) that "[f]ree liquids must be eliminated by removing liquid wastes or solidifying the remaining wastes and waste residues" sufficient to support the final cover to instead require that "*groundwater* [must be] removed from the unit prior to the start of installing the final cover system." JA__[*Id*. at 89] (emphasis added).

## 2. Expanding the Scope and Coverage of EPA's CCR Criteria

The 2022 Rule also expands the scope and coverage of EPA's CCR criteria in ways that go far beyond the 2015 Rule. The 2015 Rule limited the definition of "CCR surface impoundments" to "a natural topographic depression, man-made excavation, or diked area, which is designed to hold an accumulation of CCR and liquids, and the unit treats, stores, or disposes of CCR," 40 C.F.R. §257.53, and excluded units closed before the regulation's effective date. The 2022 Rule redefines "CCR surface impoundment" to include any closed unit with its "base (or

any part of its base) [ ] in contact with groundwater." JA__[Doc. 1942829 at 20]. And EPA now takes the position that self-supporting concrete tanks are CCR surface impoundments subject to regulation. JA__-__[*Id.* at 162-63].

The 2015 Rule also excluded "practices that meet the definition of a beneficial use of CCR." 40 C.F.R. §257.50(g). But EPA now says that "'beneficial use' is irrelevant" when a facility uses CCR for the beneficial purpose of providing structural support for the final cover system, rather than supporting the cover system with clean fill material that would have to extracted and transported from another source. JA__[Doc. 1942829 at 248].

### C.    EPA's Implementation of the 2022 Rule

After announcing the new requirements on January 11, 2022, EPA moved quickly to enforce them through a series of communications with States and regulated companies, including Petitioners, and through further action in Part A extension proceedings.[3]

***Correspondence to Petitioners.*** On January 11—the same day EPA issued the action under review here—EPA sent correspondence to many of the individual

---

[3] Petitioners moved the Court to consider the extensive evidence of EPA's post-January 11 implementation of the 2022 Rule that is discussed in this section. Doc. 1967068. In response, EPA did not dispute the authenticity of the documents. *See* Doc. 1969417. A motions panel referred Petitioners' motion to the merits panel and directed the parties to address the issue in their merits briefs. Doc. 1971931. Petitioners address the relevance of these documents at pages 54-56 of this brief.

company Petitioners in this case directing them to "the Agency's press release" "[f]or more information about the Part A and other CCR actions taken today, including notifying multiple facilities about compliance issues and laying out plans for future regulatory actions." *See, e.g.*, SA-5.

     ***Classification Table.*** In a spreadsheet that became public in June 2022, EPA prepared a target list of over 160 CCR impoundments in 27 States that EPA had determined were potentially subject to the new prohibition against closure with CCR in contact with groundwater. JA\_\_-\_\_[Doc. 1967068 at 2-5]. EPA distributed this list among its regional offices, which are implementing the new requirements.

     ***The Texas Correspondence.*** On April 5, 2022, EPA Region 6 informed the Texas Commission on Environmental Quality of EPA's "January 11, 2022 … proposed decisions on several actions related to [CCR] Part A closure extension demonstrations," directing the State agency to EPA's "proposed decision[s]" for the Clifty Creek and Ottuwma generating stations (neither of which is located in Texas). JA\_\_[*Id.* at 57]. The correspondence informed Texas that EPA had identified five facilities in Texas with eleven surface impoundments that "are closing with possible waste in place" below the water table. *Id*. One of these facilities—Coleto Creek—is operated by Petitioner Coleto Creek Power, LLC, SA-7, and another—Martin Lake—is operated by Petitioner Luminant Generation Company LLC, SA-15. EPA said it was "providing this information on specific

25

units and facilities … [to] encourage states and facilities to review the proposed decisions … to understand EPA's application of closure in place with" waste below the water table.  JA__[Doc. 1967068 at 57].

*Other State Directives.*  EPA Region 4 convened a March 16, 2022 meeting with the State agencies that regulate solid-waste in eight States.  *See* JA__[*Id.* at 13]. The purpose was to convey "EPA's position that surface impoundments or landfills cannot be closed with coal ash in contact with groundwater" as stated "in Section III.E.1" of EPA's proposed decision on "Gavin Power LLC's extension request." *See id.* (citing JA__-__[Doc. 1942829 at 82-94]).  Specifically, EPA planned to discuss the "[i]mpact" on "Part A closure extension requests" of EPA's "clarification on infiltration, closure in place with waste below the water table, etc."  JA__[*Id.* at 14].  EPA Region 4 confirmed EPA's position that "[s]ome aspects of Part A decisions impact all facilities—such as interpretation of closing in place with waste below the water table (WBWT)[.]"  JA__[*Id.* at 23].  Region 5 similarly advised Indiana, Ohio, and Illinois of waste below the water table at many impoundments in those States.  *See* JA__,__,__[*id.* at 10, 44, 54].  Region 7, too, warned that "all facilities are on notice of [the proposed Part A] decisions which cover a variety of topics related to CCR management including, but not limited to, situations where groundwater intersects with the CCR unit."  JA__-__,__[*Id.* at 60-61, 64].

26

***Denial of Extension.*** On November 18, 2022, EPA published a final Part A extension denial that relied, word for word, on the new requirement first articulated in the proposed denial issued on January 11—operators can no longer meet "the performance standards in 40 C.F.R. §257.102(d)" if "CCR … remains in contact with groundwater." *See* EPA, *Final Decision: Denial of Alternative Closure Deadline for General James M. Gavin Plant*, EPA-HQ-OLEM-2021-0590-0100, at 19 (Nov. 18, 2022), https://tinyurl.com/28cejjeu ("Gavin Final Denial"). "EPA conclude[d] that at least a portion of the CCR in [Gavin's closed CCR unit] remains in contact with groundwater [and] [t]hese facts alone support the conclusion that Gavin has failed to demonstrate that the closure of the [unit] meets the performance standards in 40 C.F.R. §257.102(d)." *Id.* In an accompanying press release, EPA's Administrator "reaffirm[ed] that surface impoundments or landfills cannot be closed with coal ash in contact with groundwater." EPA, *EPA Takes Final Action to Protect Groundwater from Coal Ash Contamination at Ohio Facility* (Nov. 18, 2022), https://tinyurl.com/c66bd5pv ("Nov. 18, 2022, Press Release"); *see also* 87 Fed. Reg. 72,989 (Nov. 28, 2022) (publishing notice of availability of Gavin Final Denial).

## SUMMARY OF THE ARGUMENT

**Standing.** Petitioners have standing to challenge the 2022 Rule because company Petitioners and USWAG members are "'the object of'" the agency's

unlawfully promulgated requirements. *West Virginia v. EPA*, 142 S. Ct. 2587, 2606 (2022). EPA's new CCR criteria increase the company Petitioners' and USWAG members' regulatory burden and threaten them with substantial penalties under RCRA.

**I.** This Court has jurisdiction because EPA's January 11, 2022 pronouncements constitute new CCR regulations or requirements within the meaning of 42 U.S.C. §6976(a)(1).

**A.** The new requirements depart from the existing criteria under the 2015 Rule in two important ways. *First*, EPA announced a new prohibition on closing a CCR unit with "waste below the water table" with accompanying new definitions and requirements for "infiltration" and "free liquids." *Second*, EPA expanded the scope of the existing CCR criteria by regulating units closed prior to October 2015 as "CCR surface impoundments" if any part of the unit is in contact with groundwater; expanding the meaning of "CCR surface impoundment" to include self-supporting tanks; and narrowing the exclusion for "beneficial use" for closing units.

**B.** Each of these changes is final and otherwise reviewable. EPA's new requirements mark the consummation of the agency's decision-making process, EPA insists that the new requirements are compelled by existing law, and there is no further agency action that EPA must take for the new requirements to take effect.

28

Although EPA announced some of the new requirements in "proposed" decisions concerning extension applications, that procedural trick does not allow EPA to evade judicial review of the new criteria, which are not limited to those proceedings.

**C.**  EPA's own conduct in the real world confirms that the agency itself considers its January 11, 2022 pronouncements to impose new requirements.  For example, EPA has reaffirmed the new requirements it announced on January 11 in directives targeting States and regulated parties and in a final decision denying a Part A extension.

**D.**  Ripeness is no obstacle to this Court's review.  Petitioners bring purely legal challenges to EPA's failure to comply with the procedural prerequisites to issuing a new legislative rule and EPA's arbitrary and capricious decision-making.  And delaying judicial review would impose severe hardship on the individual company Petitioners and USWAG members because, among other things, EPA's new requirements subject them to increased risk of penalties.

**II.**  The new requirements are procedurally invalid for much the same reason as they are final and subject to judicial review under RCRA—namely, EPA promulgated a legislative rule that binds with the force of law but failed to comply with the notice-and-comment and other requirements of RCRA and the APA.  *See*

29

42 U.S.C. §§6944(a), 6974(b)(1), 6907(a); 5 U.S.C. §553.  EPA lacks the authority to promulgate RCRA criteria through guidance or adjudications.

**III.**  EPA's new criteria are invalid for the additional reason that EPA's decision was arbitrary and capricious.  EPA neglected the most basic requirements of reasoned decision-making by failing even to acknowledge its change its position, or to consider the reliance interests of regulated parties.  The new requirements also deprived company Petitioners and USWAG members of fair notice.

## STANDING

This Court has jurisdiction under Article III if "at least one group of petitioners" has standing to challenge the 2022 Rule.  *West Virginia*, 142 S. Ct. at 2606.  The individual company Petitioners are nine companies that own and operate coal-fueled power plants in Illinois, Ohio, and Texas.  USWAG is an association of approximately 130 energy companies (including company Petitioners) and trade associations in the power-generation industry.[4]

For purposes of the standing analysis, "a federal court must assume *arguendo* the merits of [a challenger's] legal claim." *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007).  Thus, to determine whether Petitioners have standing,

---

[4] USWAG regularly represents its members on regulatory matters, including CCR issues.  USWAG has associational standing because it seeks relief germane to its associational purposes, the participation of individual members is not required, and many of its members have standing in their own right. *See Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).

30

the Court can assume that the 2022 Rule is reviewable under RCRA, *see Scenic, Inc. v. DOT*, 836 F.3d 42, 55 (D.C. Cir. 2016), and that the 2022 Rule purports to impose new legal obligations, *see Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 943 (D.C. Cir. 2012).

Where a petitioner is "the object of" an agency's challenged rules, "there can be little question" that the petitioner has standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992). Here, company Petitioners' and USWAG members' facilities are the "object of" EPA's CCR rules, and their CCR units will be impacted by EPA's new requirements—specifically, EPA's new restrictions prohibiting closure-in-place where CCR is "in contact with groundwater" and EPA's expansion of the 2015 Rule's scope.

These new purported requirements injure company Petitioners and USWAG members by, for example, reclassifying dozens of CCR units as "surface impoundments … with coal ash in contact with groundwater" and imposing a new rule that purports to bar them from completing their longstanding plans to utilize the closure-in-place option as authorized by the 2015 Rule. *See* SA-25; Edwards Power Station Closure Plan (Oct. 17, 2016), https://tinyurl.com/5e8wcyzj. In response to EPA's January 11 requirements, facilities have already altered their closure plans. *See* SA-65. Vacatur of the new requirements would fully redress these injuries.

31

EPA's Classification Table—which sets out the impoundments EPA believes are subject to the new prohibition—includes seventeen impoundments owned by company Petitioners. *See* JA__-__[Doc. 1967068 at 7-8]. And EPA is actively enforcing that designation. SA-58, SA-60 to SA-61; JA__, __[Doc. 1967068 at 54, 57]; *supra* at 24-27. Thus, EPA's own actions make clear that the agency is applying the 2022 Rule to the company Petitioners' facilities. That is enough for standing because "an agency rule, unlike a statute, is typically reviewable without waiting for enforcement." *Chamber of Commerce v. FEC*, 69 F.3d 600, 604 (D.C. Cir. 1995).

EPA's expansion of the term "CCR surface impoundment" in the 2022 Rule further injures USWAG members that closed impoundments prior to 2015 and those that currently store CCR in concrete tank systems or are constructing such tanks. SA-25 to SA-26. Shortly following issuance of the 2015 Rule, EPA explained to USWAG members that the 2015 Rule's definition of "CCR surface impoundment" did not encompass previously closed units that "no longer impound liquids" or self-supporting concrete tanks. SA-24 to SA-25. The 2022 Rule now purports to retroactively impose new, onerous regulatory requirements on both.

The new requirements further injure company Petitioners and USWAG members by restricting the "beneficial use" exception in the 2015 Rule. The 2015 Rule made clear that regulated "disposal does not include the storage or the beneficial use of CCR." 40 C.F.R. §257.53. Yet the 2022 Rule would prohibit

32

placing any CCR "in a unit that is required to close," JA__[Doc. 1942829 at 248], even when that CCR is being used for the beneficial purpose of supporting a cover system to avoid the substantial costs of finding alternative fill material.

Under RCRA, company Petitioners and USWAG members would be subject to severe sanctions for non-compliance. *See* 42 U.S.C. §§6945(a), (d)(4)(A), 6972(a), 6928(a), (c), (g). Although EPA announced some of the new purported requirements in proposed extension denials or letters to other companies or State regulators, EPA is applying the new restrictions to *all* operators, not just those named in the documents under review. Indeed, EPA sent the company Petitioners correspondence notifying them of the new requirements and directing them to the agency's January 11 press release "for more information" and to "compliance issues" described in proposed extension denials involving other companies. SA-2, SA-4 to SA-21.

## ARGUMENT

### I.    This Court Has Jurisdiction

RCRA vests this Court with exclusive jurisdiction over pre-enforcement challenges to any "action of the Administrator in promulgating any regulation, or requirement under this chapter or denying any petition for the promulgation, amendment or repeal of any regulation under this chapter." 42 U.S.C. §6976(a)(1); *Ass'n of Battery Recyclers, Inc. v. EPA*, 208 F.3d 1047, 1058 (D.C. Cir. 2000).

33

Agency action is reviewable under RCRA if it "partakes of the fundamental characteristic of a regulation, *i.e.*, that it has the force of law." *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 227 (D.C. Cir. 2007) (quotation marks omitted).

There is no dispute that the existing criteria codified at 40 C.F.R. Part 257, Subpart D were promulgated through notice-and-comment rulemaking and have the force of law. In the 2022 Rule, EPA imposed new requirements that bind with the same force, mark the agency's last word on the subject, and inflict new legal obligations and practical consequences.

Moreover, RCRA generally limits review of changes like these to petitions filed within ninety days. *Gen. Motors Corp. v. EPA*, 363 F.3d 442, 451 (D.C. Cir. 2004). Petitioners were *required* to seek review of the 2022 Rule now, lest they risk forfeiting their right to challenge EPA's failure to comply with RCRA and the APA.

## A.    The 2022 Rule Functionally Amended EPA's Existing CCR Criteria

RCRA confers jurisdiction over the petitions for review because EPA's functional amendments to the existing CCR criteria are "action[s] of the Administrator in promulgating any regulation, or requirement" independently of the nominal function of the particular documents at issue. 42 U.S.C. §6976(a)(1). Because EPA's action in issuing the 2020 Rule "had the effect of amending what is undisputedly" a RCRA regulation (the 2015 Rule), it too is a RCRA regulation

34

subject to review.  *NRDC v. Wheeler*, 955 F.3d 68, 84 (D.C. Cir. 2020).  And Section 6976's specification of any EPA "action" means the statute's "jurisdictional provision does not limit review to [] actual regulations."  *Battery Recyclers*, 208 F.3d at 1058.  Rather, judicial review is available when EPA "select[s] what, in its view, is the appropriate method of ascertaining compliance with statutory and regulatory norms."  *Id.* (quotation marks omitted); *see also* 5 U.S.C. §551(13) ("agency action" includes "agency rule"), (4) ("rule" includes "part" of a forward-looking statement).

Here, Petitioners challenge new requirements that depart from and expand the scope of EPA's existing CCR criteria.  EPA announced those substantive changes in various documents issued simultaneously on January 11, 2022, in a coordinated public release.  But it is the substantive requirements announced in those documents that are at issue in this appeal, not the documents in and of themselves or EPA's company-specific decision.  This Court permits judicial review where, as here, a petitioner challenges "part of" or "elements of" documents that set forth "the agency's settled position."  *Appalachian Power*, 208 F.3d at 1020-22.  Each of the changes imposed by the 2022 Rule constitutes reviewable EPA action.

### 1.    The New Prohibition on Closure with "Waste Below the Water Table"

Under EPA's existing criteria, an impoundment that cannot continue receiving CCR must "close the CCR unit in accordance with the requirements of §257.102."  40 C.F.R. §257.101(b)(1)(i).  Section 257.102, in turn, provides *two*

*options* for the closure of the impoundment—"either" closure-in-place under Section 257.102(d), "or" closure-by-removal under Section 257.102(c). *See id.* §257.102.

The 2022 Rule eliminates one of those options for a new class of surface impoundments by directing that a facility may *not* use the closure-in-place option, under any circumstances, for the new category of landfills or impoundments with "waste below the water table." *See, e.g.*, JA__[Doc. 1967068 at 10]. EPA now says that "surface impoundments or landfills cannot be closed with coal ash in contact with groundwater." JA__[Doc. 1942829 at 11]. EPA even coined a new phrase for the requirement—"waste below the water table" or "WBWT." JA__[Doc. 1967068 at 10].

The plain language of the existing regulations does not contain any such classification or categorical prohibition, nor was that the intent of the 2015 Rule. Indeed, EPA explained that the 2015 Rule does not "require clean closure nor [] establish restrictions on the situations when clean closure would be appropriate." 80 Fed. Reg. at 21,412. Even the proposal, which would have prohibited the disposal of CCR below the "natural water table," did not require "clean closure" of these units; instead, EPA explained that facilities would have "flexibility … in their closure options." 75 Fed. Reg. at 35,208. In response to comments on this very point, EPA specifically stated that the final regulations do *not* limit closure options based on proximity to the water table:

36

Comment: "Will removal of CCR be required in cases where the base of an existing or abandoned surface impoundment or landfill is shown to be below the natural water table?"

EPA Response: "If a unit fails to meet the location criteria applicable to existing CCR units, the unit must initiate closure as required under the rule. … *This rule does not require clean closure of any unit*."

JA__[EPA, *Comment Summary and Response Document, Vol. 9*, at 197 (Dec. 2014)] (emphasis added).

The only distinction in the existing regulations between different categories of impoundments that are required to close is that some impoundments that are not closing under the "uppermost aquifer" restriction must initiate closure sooner (within six months). *Compare* 40 C.F.R. §257.101(b)(1)(i), *with id.* §257.101(b)(1)(ii). Thus, EPA's existing criteria make distinctions among requirements for different categories of impoundments that must close, but only with respect to timing. Notably, the existing criteria do not create any categorical prohibitions for impoundments with CCR below the "water table" or in contact with "groundwater." Rather, the entire concept of "natural water table" was proposed and rejected in the 2015 Rule. *Supra* at 10-11. EPA's new prohibition on "waste below the water table" is a complete about-face that resurrects and adopts this concept—a concept EPA determined was too "difficult to determine"—without notice and comment.

In an attempt to shoehorn the new prohibition into the text of the existing regulations, EPA changes the meaning of key terms in 40 C.F.R. §257.102(d), which

37

provides the requirements for closure-in-place.  In particular, in the 2022 Rule, EPA changes the meaning and context of "infiltration" and "free liquids."

In the 2022 Rule, EPA defines "infiltration" to mean "*any kind* of movement of liquids into a CCR unit," including "any liquid passing into or through the CCR unit by filtering or permeating from any direction, including the top, *sides, and bottom of the unit*."  JA__[Doc. 1942829 at 90] (emphases added).  But the text and structure of Section 257.102 demonstrate that the requirement to "[c]ontrol, minimize or eliminate" "infiltration" and "releases" in Subsection 257.102(d)(1)(i) is linked solely to the downward movement of water through the final cover system.  *See* 40 C.F.R. §257.102(b)(1)(iii) ("The closure plan must also discuss how the *final cover system* will achieve the performance standards specified in paragraph (d) of this section." (emphasis added)); 80 Fed. Reg. at 21,414 (equating performance standard in 40 C.F.R. §257.102(d)(1)(i) to final cover system "[a]s discussed in the previous section"); *supra* at 12-13.  When EPA issued the 2015 Rule, it specifically explained that the performance standard in 40 C.F.R. §257.102(d)(1)(i) was directed to the final cover system:  "The final rule requires that *any final cover system* control, minimize or eliminate, to the maximum extent practicable, post-closure infiltration of liquids into the waste and releases of leachate (in addition to CCR or contaminated run-off) to the ground or surface waters."  80 Fed. Reg. at 21,413 (emphasis added).

Further, there is nothing in the text of Section 257.102(d)(1)(i) that prohibits all "contact" between CCR and groundwater, as the 2022 Rule does, or even prohibits all releases to groundwater. The plain language requires the operator only to "[c]ontrol, *minimize* or eliminate, *to the maximum extent feasible*" post-closure infiltration and releases. 40 C.F.R. §257.102(d)(1)(i) (emphases added). To the extent monitoring at a closed-in-place unit (which must extend for thirty years) reveals concentrations of contaminants above defined levels, the operator must take corrective action. *Id*. §257.104. But the potential for such a condition does not prohibit closure-in-place outright. Indeed, in assessing the risk of the closure-in-place option, EPA acknowledged that CCR impoundments "come in direct contact with the water table," yet found that "releases from surface impoundments drop dramatically after closure, even with waste in place" so much so that there is a "negligible effect on modeled risks" when closing in place. JA__,__-__[Risk Assessment at 5-10, 5-28 to 5-29].

The "history[] and purpose of" Section 257.102(d) further compel this reading. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019); *see also Newman v. FERC*, 27 F.4th 690, 700 (D.C. Cir. 2022) (granting petition where regulatory history contradicted agency interpretation); *Appalachian Power*, 208 F.3d at 1026 (rejecting EPA interpretation that was inconsistent with "the regulatory history," including "EPA's commentary at the time" it promulgated a regulation). In 2015, EPA stated

39

that the performance standard in Section 257.102(d)(1) was adopted "without revision" from the proposed rule. *See* 80 Fed. Reg. at 21,414. Thus, like the proposal, the final performance standard in Section 257.102(d)(1)(i) was intended as a requirement to "[c]over the surface impoundment *with a final cover designed and constructed to*: (i) Provide long-term minimization of the migration of liquids through the closed impoundment[.]" 75 Fed. Reg. at 35,252. Indeed, the proposal did not even use the word "infiltration," *id*., much less give that term dispositive effect that renders all other aspects of the performance standard redundant. Neither the proposed performance standard nor the final regulation speaks to any general requirement to prevent any and all groundwater from entering the closed unit from the bottom or sides. *Supra* at 7-8, 11-15. In both, the standard was tied to the final cover.

The same is true for the other waste-management programs that EPA used as the "model" for Section 257.102(d). In both the industrial waste and hazardous waste contexts, EPA regulates "infiltration" only as the downward movement of water through the final cover. *Supra* at 14-15. In those contexts, EPA has clearly indicated that impoundments may be closed in place, even with waste in contact with groundwater and below the water table, *id.*, and in some cases *must be* closed in place in such cases. *See* 2003 Guidance at 11-4 ("[I]f the waste volumes are large and underlying soil and ground water are contaminated, closure by total waste

40

removal might not be possible."). The 2022 Rule is a stark departure from this decades-long, consistent approach. And, because CCR is a solid waste that is regulated "much more loosely" than hazardous waste, it would be unlawful to amend Section 257.102(d)(1) to be more restrictive than the requirements for hazardous waste impoundments. *City of Chicago v. Envtl. Def. Fund,* 511 U.S. 328, 331 (1994); *see also Cal. Cmtys. Against Toxics v. EPA,* 928 F.3d 1041, 1053 (D.C. Cir. 2019) ("In RCRA, Congress required EPA to regulate both hazardous and non-hazardous 'solid waste,' with more stringent requirements applying to hazardous waste."). Yet the 2022 Rule would do just that.

Instead of citing any regulatory text or historical context to support the new requirements, EPA cites the general dictionary definition of "infiltration." JA__[Doc. 1942829 at 90]. But the regulatory text uses "infiltration" in its technical sense and in relation to the "final cover system." *Supra* at 12-13. Thus, because the regulation here "focuses on a specific technical context," it is more "useful and important to consult more technical sources" (such as EPA's long-standing RCRA guidance and practice, *supra* at 14-15) than "contemporary general-usage dictionaries." *See Am. Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 796 F.3d 18, 26 (D.C. Cir. 2015). This is especially true here because the 2015 Rule requires qualified professional engineers—who rely on technical information

41

sources, not "general dictionary definitions"—to certify compliance with the closure performance standard.  *See* 40 C.F.R. §257.102(f)(3).

The 2022 Rule also redefines the term "free liquids" to include *any* "groundwater" that "intersects" or contacts the impoundment.  JA__[Doc. 1942829 at 89].  Based on this new definition, EPA now requires that "groundwater [must be] removed from the unit prior to the start of installing the final cover system" and presumably prevented from re-entering.  *Id.*  But the existing regulations, which were drafted "precisely" to enable implementation without after-the-fact "clarifications" by EPA, 80 Fed. Reg. at 21,402, do not define "free liquids" to include "groundwater."  The regulations define "free liquids" as "liquids that readily separate from the solid portion of a waste *under ambient temperature and pressure*." *See* 40 C.F.R. §257.53 (emphasis added).  "Groundwater" is *separately* defined as "water *below* the land surface in a zone of saturation," *id.* (emphasis added), but is not mentioned in Section 257.102(d)(2) or in Section 257.53's definition of "free liquids."  Thus, while it may be true in a simplistic sense that "groundwater" is a "liquid," as EPA claims in the 2022 Rule (JA__[Doc. 1942829 at 89]), "groundwater" is not a "free liquid" under the definition in the regulations.  Other administrative bodies considering this *precise* question have concluded, consistent with RCRA's regulatory history, that the term "free liquids" "is not a new term under RCRA and the Federal CCR Rule" and is well understood *not* to encompass

42

groundwater. *See Duke Energy*, 2021 OEA 25, 2021 WL 2301805, at *12 ¶¶30, 32-35 (Ind. Dep't of Envtl. Mgmt. May 4, 2021) ("Consequently, for present purposes, 'free liquids' in the Federal CCR rule consists of the water that separates from sluiced ash and forms the surface water in an ash pond.").

EPA's new "free liquids" requirement further conflicts with the plain language and intent of Section 257.102(d)(2), which does not require the removal of *all* liquid or groundwater from a closed CCR impoundment (or preventing it from returning) but only "removing *liquid wastes* or solidifying the remaining *wastes* and waste residues" "prior to installing the final cover" "sufficient to support the final cover system." 40 C.F.R. §257.102(d)(2) (emphases added); *see also supra* at 11-15. "Groundwater" is not a "waste"—it is "water below the land surface in a zone of saturation." 40 C.F.R. §257.53. EPA knew when it promulgated the 2015 Rule that many impoundments "come in direct contact with the water table," JA__[Risk Assessment at 5-10], yet nothing in the text of the existing regulations or EPA's contemporaneous explanation of them remotely suggests that the regulations require the removal of all groundwater prior to (or after) closure-in-place. Again, the 2022 Rule is a first.

Finally, in discussing the new prohibition against closure with CCR in contact with groundwater, the 2022 Rule references in passing the performance standard in Section 257.102(d)(1)(ii), which requires the operator to "[p]reclude the probability

43

of future impoundment of water, sediment, or slurry[.]" JA__[Doc. 1942829 at 88]. However, this aspect of the existing regulations was included to address the downward movement of water through the final cover system, as EPA specifically stated in response to comments. *See* JA__[EPA, *Comment Summary and Response Document, Vol. 10* at 38 (Dec. 2014)] ("[T]he final rule includes a closure performance standard that requires the final cover system to be designed in a manner that will preclude the probability for future impoundment of water, sediment, or slurry."). Thus, as with the other aspects of Section 257.102(d)(1), the intent of this provision is directed at the final cover system, not the lateral movement of groundwater into the closed unit. To the extent the 2022 Rule applies this provision to the lateral movement of groundwater, that, too, is a revision of the existing regulations and a departure from their original meaning.

### 2. The 2022 Rule Expands the Scope of EPA's CCR Rules in Three Ways

EPA also expanded the scope of its existing CCR rules by (1) redefining "inactive CCR surface impoundment" to include facilities that have been closed for decades; (2) redefining "CCR surface impoundment" to include self-supporting tank systems; and (3) imposing a new prohibition against the "beneficial use" of CCR to support final cover systems.

***Inactive surface impoundments.*** The 2015 Rule defines a "CCR surface impoundment" to mean "a natural topographic depression, man-made excavation, or

44

diked area, which is *designed to hold an accumulation of CCR and liquids*, and the unit treats, stores, or disposes of CCR." 40 C.F.R. §257.53 (emphasis added). Thus, the 2015 Rule did not "impose any requirements on any CCR surface impoundments that have in fact 'closed' before the rule's effective date—*i.e.*, those that no longer contain water and can no longer impound liquid." 80 Fed. Reg. at 21,343.

The 2022 Rule would regulate these previously closed units for the first time. In the 2022 Rule, EPA states that a CCR unit that "contains liquid because its base (or any part of its base) is in contact with groundwater [] would meet the definition of an inactive CCR surface impoundment," even if that unit had closed prior to the effective date of the 2015 Rule. JA__[Doc. 1942829 at 20]. Thus, the 2022 Rule eliminates the requirement in the existing regulations that a regulated impoundment must be "designed to hold an accumulation of CCR and liquids" and replaces it with a new definition that encompasses previously closed impoundments with CCR "in contact with groundwater."

In so doing, the 2022 Rule significantly expands the coverage of the CCR criteria. When defining "CCR surface impoundment" in the 2015 Rule, EPA stated that the phrase "designed to hold an accumulation of CCR and liquids" means only units that "contain a large amount of CCR managed with water, under a hydraulic head that promotes the rapid leaching of contaminants." 80 Fed. Reg. at 21,357. EPA was "extremely clear" on this point so that operators could "easily discern

45

whether a particular unit is a CCR surface impoundment." *Id*. Nevertheless, the 2022 Rule upends this settled approach and now regulates any CCR unit as a CCR surface impoundment—even if it has been closed for decades—if there is CCR in contact with groundwater.

***Self-supporting tank systems.*** The 2022 Rule changes the meaning of "CCR surface impoundments" to include self-supporting tank systems. JA__-__[Doc. 1942829 at 163-64]. EPA now takes the position that if a tank is "partially below grade and surrounded by CCR material," even though the tank is fully self-supported, the tank is "a man-made depression." *Id*. But the 2015 Rule does not define "CCR surface impoundment" to include "tanks"—a fact confirmed by EPA directly to USWAG members shortly after the 2015 Rule was promulgated. *See* SA-24. Only "natural topographic depressions," "diked areas," and "man-made excavations"—not tanks or man-made depressions—can be surface impoundments under the existing regulations.

***Beneficial use.*** The plain language of the existing regulations excludes *all* beneficial use of CCR from the scope of EPA's criteria. 40 C.F.R. §257.50(g); *see also id*. §257.53 ("disposal does not include … the beneficial use of CCR"). And because beneficial use is not "disposal," it is also not "placement." 42 U.S.C. §6903(3) (definition of "disposal"). The beneficial use of CCR is therefore exempt from the requirement in Section 257.101(a)(1) to "cease placing CCR and non-CCR

46

wastestreams" into CCR units that are required to close.  Accordingly, under the existing regulations, a facility may use CCR for the beneficial purpose of supporting a final cover system without violating Section 257.101 so long as the facility otherwise meets all of the regulatory conditions for "beneficial use."  40 C.F.R. §257.53.

EPA's new position abrogates that exception and would "prohibit[] placing CCR in a unit that is required to close" because, EPA now says, "considering this placement a 'beneficial use' is irrelevant."  JA__[Doc. 1942829 at 248].  Contrary to the 2015 Rule and the statutory definition of "disposal," EPA now "does not distinguish between placement that might be considered beneficial use and placement that might be considered disposal for units that are required to close."  JA__[*Id.* at 249].

### B.    The 2022 Rule Is Final and Otherwise Reviewable

RCRA provides for review of the new requirements described above because they impose additional "regulation[s]" or "requirement[s]" on operators and States. 42 U.S.C. §6976(a)(1).  The test for RCRA jurisdiction synthesizes finality and ripeness by asking "whether the agency action … has the force of law."  *Gen. Motors*, 363 F.3d at 448 (quoting *Molycorp, Inc. v. EPA,* 197 F.3d 543, 545 (D.C. Cir. 1999)).

47

An EPA pronouncement has the force of law when it "mark[s] the consummation of EPA's decisionmaking process [and] impose[s] new substantive rights or obligations on field personnel, the States, or third parties," *id.* at 450, or is "binding as a practical matter" under the regulatory regime at issue, *Cement Kiln*, 493 F.3d at 227 (quotation marks omitted). This Court has "eschew[ed] the notion that [an agency's] labels are definitive" in determining whether the agency's actions are reviewable. *Gen. Motors*, 363 F.3d at 448.

### 1. The 2022 Rule Marks the Consummation of EPA's Decision-making Process

The 2022 Rule reflects the consummation of EPA's decision-making process for at least three reasons. *First*, the new CCR requirements were promulgated by the highest-ranking officials at EPA. The agency's press release includes quotations from the EPA Administrator trumpeting "[t]oday's actions." JA__[Doc. 1942829 at 9]. The "proposed" Part A decisions setting forth in detail EPA's newly announced closure requirements are signed by the Acting Assistant Administrator responsible for RCRA enforcement. JA__,__,__[*Id.* at 132, 212, 285]; 42 U.S.C. §6911(a); 40 C.F.R. §1.47. And the compliance letters to Georgia and individual companies are signed by Office Directors one step down from Assistant Administrators. JA__,__,__,__,__[Doc. 1942829 at 17, 22, 28, 31, 42]. This Court has repeatedly held that officials like these "speak[] in EPA's voice" and, on that basis, the Court has attributed their statements to the agency. *POET Biorefining, LLC v. EPA*, 970

48

F.3d 392, 404 (D.C. Cir. 2020); *see also Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 636 (D.C. Cir. 2019) (Assistant Administrator); *Appalachian Power*, 208 F.3d at 1019, 1020 n.10 (Office Directors).

*Second*, EPA has "unequivocally state[d]" that the amendments effected by the 2022 Rule are "'compel[led]'" by the plain language of the existing regulations. *Cal. Cmtys.*, 934 F.3d at 636; *see also Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435-37 (D.C. Cir. 1986). For example, EPA's January 11, 2022 press release declares (erroneously) that it is "EPA's consistently held position that surface impoundments or landfills cannot be closed with coal ash in contact with groundwater." JA__[Doc. 1942829 at 11]; *see also* Gavin Final Denial at 32 (asserting that the new prohibition on closure with waste-below-the-water-table is "based on a straightforward reading of the plain language" of the 2015 Rule).

As explained above, EPA's purported "explanation" of the *existing* regulations is a ruse—the requirements announced on January 11, 2022, appeared for the first time in the documents the agency released on that day, which is why the agency pointed Georgia to one of its "proposed" denial orders, not the Code of Federal Regulations. JA__[Doc. 1942829 at 16]. But for purposes of this Court's authority to *review* EPA's new requirements, the agency's assertion that the requirements flow from existing regulations means the agency's decision-making process is over. *See, e.g.*, *Cal. Cmtys.*, 934 F.3d at 636.

49

*Third*, "there is no further agency action for [Petitioners] to invoke or to exhaust to plead [their] cause." *Ipsen Biopharms., Inc. v. Azar*, 943 F.3d 953, 958 (D.C. Cir. 2019). EPA's decision to ignore the notice-and-comment requirements of RCRA and the APA means that Petitioners never had the opportunity to dissuade the agency from changing its existing CCR criteria *before they were applied*. And all of EPA's communications with States and regulated parties have treated the 2022 Rule as a final statement of the agency's position effective immediately. For example, EPA "reaffirm[ed]" the agency's January 11, 2022 pronouncements in its final decision on one of the Part A extension proceedings. *See* Nov. 18, 2022, Press Release; *supra* at 27 (describing Gavin Final Denial).

Even if EPA's new criteria were hypothetically "subject to change" in some of the agency's other pending Part A extension proceedings, that would be irrelevant. "[A]ll laws are subject to change," and so the mere "fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment." *Appalachian Power*, 208 F.3d at 1022; *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016).

"[T]he applicable test is not whether there are further administrative proceedings available, but rather whether the impact of [an agency's] order is sufficiently final to warrant review in the context of the particular case." *Clean Air Council v. Pruitt*, 862 F.3d 1, 123 (D.C. Cir. 2017) (per curiam) (quotation marks

and alteration omitted). To be sure, EPA announced some of its new CCR requirements through the procedural gimmick of slipping them into discrete sections of proposed denials of companies' extension applications and incorporating those sections into its directives to States, other regulated parties, and the public. But EPA has "publicly articulate[d] an unequivocal position [] and expects regulated entities to alter their primary conduct to conform to that position." *Ciba-Geigy*, 801 F.2d at 436. Thus, "the agency has voluntarily relinquished the benefit of postponed judicial review." *Id.*

### 2. The 2022 Rule Imposes New Obligations on Regulated Parties and States

Under the second prong of the finality analysis, the 2022 Rule has "concrete consequences" for regulated parties and the States "as a result of the specific statutes and regulations" governing CCR. *POET*, 970 F.3d at 405 (quotation marks omitted). A document can be binding even "before it is actually applied if the affected private parties are reasonably led to believe that failure to conform will bring adverse consequences[.]" *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) (quotation marks and citation omitted). Revisions to requirements that are already applicable to a regulated party necessarily "determine[]" "rights and obligations or effect [the] legal consequences" of failing to comply. *NRDC*, 955 F.3d at 80. Here, EPA's new requirements remove important compliance options and impose new

obligations on regulated parties, jeopardize States' ability to maintain approved CCR programs, and subject operators to an increased risk of penalties.

Specifically, EPA's January 11 pronouncements make clear EPA's position that: (1) CCR units "cannot be closed with coal ash in contact with groundwater," JA__[Doc. 1942829 at 11]; *supra* at 22-23; (2) a regulated "impoundment" includes *any* CCR unit (even a previously closed one) with its "base (or any part of its base) [ ] in contact with groundwater." JA__[Doc. 1942829 at 20]; *supra* at 23-24; (3) self-supporting tanks are regulated CCR surface impoundments, *id.*; and (4) the "beneficial use" of CCR is "not distinguish[ed]" from waste CCR when it enters a closing CCR unit, JA__[Doc. 1942829 at 249]; *supra* at 24.

These new restrictions are axiomatic examples of legal consequences signaling final agency action. In *Hawkes*, a positive "Jurisdictional Determination" was final because it denied the plaintiff the benefit of immunity from pollution claims that would have been conferred by a negative determination. 578 U.S. at 599. In *POET*, EPA guidance was final "because it withdr[ew] some of the discretion the [rule] afforded EPA in evaluating the reliability of peer-reviewed methodologies" and thereby impacted "producers like POET seeking to show EPA that their method meets the [rule's] requirements." 970 F.3d at 405. Here, similarly, EPA's new restrictions deny operators the benefit of the compliance options they had under the

2015 Rule. Such changes "alter the legal regime" and therefore have "direct and appreciable legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

The 2022 Rule also subjects operators to increased risk of sanctions. *See Sackett v. EPA*, 566 U.S. 120, 127 (2012); *Ipsen Biopharms.*, 943 F.3d at 957 & n.3. For example, EPA now considers facilities to be in "violation of 40 C.F.R. §257.102(b)" if their closure plans do not account for the "infiltration" of groundwater per EPA's new definition. JA__-__[Doc. 1942829 at 90-91]. RCRA subjects companies that unlawfully dispose of CCR to civil penalties of up to $65,666 per day. 42 U.S.C. §6928(a)(3), (g); 87 Fed. Reg. 1,676, 1,679 (Jan. 12, 2022) (inflation adjustment).[5] And EPA has shown its willingness to impose retroactive sanctions for noncompliance with the new criteria by denying Part A extensions to companies that utilized the closure-in-place option with impoundments in contact with groundwater. *Supra* at 27 (discussing Gavin Final Denial). Thus, the new requirements "cast a cloud of uncertainty over the viability of [company Petitioners' and USWAG members'] ongoing business" and put them "to the painful choice between costly compliance and the risk of prosecution at an uncertain point in the future." *CSI Aviation Servs., Inc. v. DOT*, 637 F.3d 408, 412 (D.C. Cir. 2011).

---

[5] *See, e.g.*, *In re Pub. Serv. Co. of Colorado, Comanche Station*, Docket No. RCRA-08-2022-0008, 2022 WL 1688366, at ¶¶27, 64-66, 140 (EPA Region 8 May 20, 2022) (imposing $925,000 in penalties for alleged violation of EPA's CCR rules).

53

Finally, "EPA has given the States their 'marching orders' and EPA expects the States to fall in line[.]" *Appalachian Power*, 208 F.3d at 1023. RCRA provides that EPA may withdraw its approval of State permit programs for CCR if EPA identifies "deficiencies" in a State's program that render it less "protective" than federal criteria. *See* 42 U.S.C. §6945(d). Here, on the same day EPA announced its new CCR requirements, the agency instructed Georgia to "review its pending and issued CCR permits" in light of the new criteria in "Section III.E.1 of the proposed decision" on "Gavin Power LLC's extension request." JA__[Doc. 1942829 at 16]; *see supra* at 21. Thus, as in *Appalachian Power*, EPA's announcement was final agency action because it set forth "the agency's settled position," which "it plan[ned] to follow in reviewing State-issued permits," and which it would "insist State and local authorities comply with." 208 F.3d at 1022.

### C. EPA Treats the 2022 Rule as Binding on Regulated Parties, States, and EPA Itself

EPA's conduct since announcing the new requirements removes any doubt that EPA is treating its January 11, 2022 pronouncements as a final binding rule. Agency action like the 2022 Rule is final and reviewable where it "is applied by the agency in a way that indicates it is binding." *Gen. Elec.*, 290 F.3d at 383; *see also Appalachian Power*, 208 F.3d at 1021 (agency action is reviewable if the agency treats it as "controlling in the field"; "in the same manner as it treats a legislative

54

rule"; or "bases enforcement actions on the policies or interpretations formulated in the document").

In similar circumstances, this Court has regularly looked outside the administrative record to post-decision "events to determine whether the agency has applied the [action] as if it were binding on regulated parties." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014); *see also, e.g.*, *POET*, 970 F.3d at 405 (agency's post-decision letter was "properly part of our finality analysis"). This Court considers extra-record evidence that postdates the agency action under review both to confirm that it has jurisdiction, *see Gen. Motors*, 363 F.3d at 449, and to determine whether a legislative rule is masquerading as something less formal or non-final, *Appalachian Power*, 208 F.3d at 1021.

The Court should do the same here. EPA's actions since January 11, 2022, make crystal clear that the agency expects private companies, States, and the agency's regional officials to comply with the new requirements. EPA instructed Georgia to review its "pending and issued CCR permits" for compliance with EPA's January 11 pronouncements. JA__[Doc. 1942829 at 16]; *supra* at 21. EPA sent similar warnings to Texas and company Petitioners. *See supra* at 24-26.

And EPA identified more than 160 CCR impoundments—including many owned by the individual company Petitioners and USWAG members—that EPA has determined are subject to the new categorical prohibition against closure with "waste

below the water table." JA__-__[Doc. 1967068 at 2-5]; *supra* at 25. EPA's regional

offices communicated the new prohibition against "waste below the water table" and

other aspects of the 2022 Rule to other State agencies and directed them to

implement those new provisions in their regulatory programs for *all facilities*. *See*

JA__,__,__,__[Doc. 1967068, Exs. B, E, I, J]; *supra* at 26.

### D.    Ripeness Poses No Obstacle to This Court's Review

For similar reasons, Petitioners' facial challenges to the new requirements are

ripe. In traditional APA cases, "a court assessing whether a case is ripe must

consider [1] the fitness of the issues for judicial decision and [2] the hardship to the

parties of withholding court consideration." *Edison Elec. Inst. v. EPA*, 996 F.2d 326,

333 (D.C. Cir. 1993) (quotation marks omitted). Ripeness has limited application to

challenges brought under RCRA, however, because "Congress has affirmatively

expressed a preference for prompt review of RCRA regulations[.]" *Id.*; *see also*

*Cement Kiln*, 493 F.3d at 215, n.3 (similar); *Molycorp*, 197 F.3d at 547 (similar).

Here, the purely legal challenges to the facial validity of EPA's January 11

actions are "presumptively reviewable" and therefore ripe for review by this Court.

*Cement Kiln*, 493 F.3d at 215 (quotation marks omitted). Specifically, Petitioners

contend that the 2022 Rule is a legislative rule promulgated without notice and

comment and is otherwise unlawful because it is arbitrary and capricious. "It is well-

established that" claims like these "'present purely legal issues.'" *Id.*

"[W]here the first prong of the ripeness test is met and Congress has emphatically declared a preference for immediate review … no purpose is served by proceeding to the second prong." *Gen. Elec.*, 290 F.3d at 381 (quotation marks, citation, and alterations omitted).  In any event, the hardship of delaying review of EPA's new CCR criteria, which will impose massive and irrecoverable costs on CCR units across the country and subject regulated parties to the risk of penalties, is more than sufficient to warrant this Court's intervention.

## II.    The 2022 Rule Is a Legislative Rule That Did Not Satisfy the Procedural Requirements of RCRA or the APA

On the merits, the Court should grant the petitions for review because EPA's new requirements are legislative rules promulgated in violation of RCRA and the APA's procedural requirements.  Congress required EPA to promulgate solid-waste criteria as "regulations" and only "after notice," "public hearings," "consultation with the States," and notice to Congress.  42 U.S.C. §§6944(a), 6974(b)(1), 6907(a).  In addition, "[l]egislative rules" are subject to notice-and-comment procedures, while "interpretive rules" and "policy statements" generally are not.  *Nat'l Mining*, 758 F.3d at 251.  The distinction between legislative rules and other agency pronouncements turns on "the actual legal effect (or lack thereof) of the agency action in question on regulated entities."  *Id.* at 252.

RCRA jurisdiction is not coextensive with the APA's distinction between legislative and interpretive rules.  *See, e.g.*, *POET*, 970 F.3d at 407 (reviewing

57

interpretive rule under judicial-review provision in the Clean Air Act). But the relevant tests are "substantially similar," *Cement Kiln*, 493 F.3d at 226, n.14, and this Court has often found finality and a violation of the APA's notice-and-comment requirements using virtually identical rationales, *see, e.g.*, *Appalachian Power*, 208 F.3d at 1020-29.

Here, the analysis is straightforward—EPA's 2022 criteria are legislative rules with the force of law because they constitute final agency action with binding legal and practical consequences for regulated parties and the States, for the reasons explained above. "Having accorded such substantive significance" to the new criteria, EPA "is compelled by the APA to utilize notice-and-comment procedures in promulgating them." *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 949 (D.C. Cir. 1987).

Notice and comment is required by the APA for the further reason that EPA's new criteria effectively amend the 2015 Rule, which is itself a legislative rule promulgated through notice and comment. *See supra* at 34-47. "[I]f a second rule repudiates or is irreconcilable with [a prior legislative rule], the second rule must be an amendment of the first; and, of course, an amendment to a legislative rule must itself be legislative." *Am. Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993) (quotation marks omitted).

Because EPA's new criteria are a legislative rule (or rules), EPA clearly violated RCRA and the APA by promulgating them through a press release, guidance documents, compliance letters, and cut-and-paste "explanations" that the agency inserted into "proposed" denials of extension applications and compliance letters. *See Shell Oil Co. v. EPA*, 950 F.2d 741, 746 (D.C. Cir. 1991). It is undisputed, for example, that EPA failed to publish any of these new criteria as a proposed rule in the Federal Register and allow interested parties to comment on them *prior to implementing them*. *See* 5 U.S.C. §553(b). That would not have been sufficient by itself to comply with the agency's procedural obligations—for example, the agency was also required to consult with the States and Congress—but that failure alone renders EPA's action unlawful.

Nor do the post hoc comment periods in EPA's Part A extension proceedings somehow excuse the agency's failure to subject its new CCR requirements to notice and comment. "An agency may not introduce a proposed rule in this crabwise fashion," and "[n]or [can] the defect [be] cured" by the fact that some regulated parties attempted to comment. *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1323 (D.C. Cir. 1988) (procedural violation where agency accepted comments on individual determinations and finalized a pre-determined, broadly applicable rule).

Even setting aside EPA's failure to subject the 2022 Rule to notice and comment, the agency's new requirements would still be invalid for at least two reasons. *First*, RCRA does not authorize EPA to promulgate new criteria through guidance documents or adjudications. *See* 42 U.S.C. §6944(a) (EPA "shall *promulgate regulations* containing criteria…." (emphasis added)); *see also, e.g.*, *AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1349 (2021) (vacating agency orders where statutory scheme showed Congress intended agency to use specific procedures). Criteria may only be promulgated as "regulations," not through "informal adjudications" purporting to announce rules. Thus, EPA cannot promulgate CCR criteria through, for example, proceedings to determine applications for Part A extensions, which EPA itself describes as "not a rulemaking, but an informal adjudication." 85 Fed. Reg. at 53,552.

*Second*, EPA cannot impose requirements that contradict the text of its existing requirements in the Code of Federal Regulations. *See, e.g.*, *Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("[I]t is incumbent upon agencies to follow their own procedures."); *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 536 (D.C. Cir. 1986) ("It is axiomatic that an agency must adhere to its own regulations.").

## III.    The 2022 Rule Is Also Substantively Unlawful

Even if EPA had complied with the required statutory procedures, the 2022 Rule is arbitrary and capricious.[6]

### A.    EPA Has Failed to Provide a Reasoned Explanation for Its Change in Position

The 2022 Rule is arbitrary and capricious because EPA failed to explain its departure from the 2015 Rule and EPA's contemporaneous explanations of that rule. A "central principle of administrative law is that" when an agency changes its "past practices and official policies [it] must at a minimum acknowledge the change and offer a reasoned explanation for it." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017). "Reasoned decision-making requires that when departing from precedents or practices, an agency must offer a reason to distinguish them or explain its apparent rejection of their approach." *Physicians for Soc. Responsibility v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020) (quotation marks omitted).

---

[6] Even if EPA's new requirements were merely interpretations of the existing regulations, and not legislative rules, those interpretations would nonetheless be reviewable as interpretive rules and subject to the substantive requirements of RCRA and the APA. *See POET,* 970 F.3d at 406 (reviewing EPA guidance as interpretive rule); *Nat'l Mining*, 758 F.3d at 251 ("In terms of reviewability, legislative rules and sometimes even interpretive rules may be subject to pre-enforcement judicial review[.]" (citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 477-79 (2001))).

Here, EPA failed to acknowledge its change in position at all—much less provide a reasoned explanation for the change. Instead, EPA insists that its January 11, 2022 pronouncements simply "re-state[d] EPA's consistently held position that" for example, "surface impoundments or landfills cannot be closed with coal ash in contact with groundwater." JA__[Doc. 1942829 at 11]. As explained above, *supra* at 34-47, "[t]hat argument flatly defies the plain text of the official [regulations], repeated official agency statements, and [years] of agency practice." *Am. Wild Horse*, 873 F.3d at 924. EPA's "failure even to acknowledge" that it was changing its position makes EPA's decision arbitrary and capricious. *Id.* at 927-28. "Blinders may work for horses, but they are no good for administrative agencies." *Id.* at 924.

## B.    EPA Failed to Consider Reliance Interests, and Its Change in Position Deprived Petitioners of Fair Notice

EPA also failed to consider Petitioners' reasonable reliance on the plain language of the existing regulations and EPA's prior explanations of them. The Due Process Clause guarantees individuals "an opportunity [1] to know what the law is and [2] to conform their conduct accordingly." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). Those "[t]raditional concepts of due process" are "incorporated into administrative law." *Satellite Broad. Co. v. FCC*, 824 F.2d 1, 3 (D.C. Cir. 1987); *see also PHH Corp. v. CFPB*, 839 F.3d 1, 49 (D.C. Cir. 2016), *reinstated in relevant part*, 881 F.3d 75, 83 (D.C. Cir. 2018) (en banc) (discussing fair-notice doctrine).

62

Moreover, "[i]n explaining its changed position, an agency must also be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016). An agency must "assess whether there [are] reliance interests, determine whether they [are] significant, and weigh any such interests against competing policy concerns." *DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020). These rules apply both to retroactive penalties and other kinds of harms where regulated parties take action based on their reasonable belief that they were complying with an agency's rules. *See Satellite Broad.*, 824 F.2d at 3-4; *see also, e.g.*, *FCC v. Fox Television Stations, Inc.* ("*Fox II*"), 567 U.S. 239, 253 (2012) (FCC enforcement action was unlawful even where the FCC declined to impose retroactive sanctions).

Here, EPA failed entirely to consider the significant reliance interests of company Petitioners, USWAG members, and other similarly-situated companies in the CCR criteria as written and applied prior to January 11, 2022. Their reliance was real and demonstrated. The 2015 Rule applied a series of hard deadlines to existing facilities. Closure plans were required to be certified by October 2016; monitoring networks were required to be in-service by October 2017; requests for Part A extensions due to lack of "alternative disposal capacity"—including certification of compliance with the regulations—were due by November 2020. 40

63

C.F.R. §§257.60(c)(1), 257.90(b)&(e), 257.102(b)(2)(i).  Company Petitioners and USWAG members undertook all of these activities in reliance on the 2015 Rule, as EPA applied it at the time.  "It [is] arbitrary or capricious to ignore such matters." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

EPA's new requirements impose even more serious consequences on regulated parties that relied on the 2015 Rule.  EPA is purporting to apply its new requirements retroactively and deems an operator in "violation of 40 C.F.R. §257.102(b)" if the closure plan the operator *previously prepared and certified* by the October 2016 deadline does not account for the "infiltration" of groundwater per EPA's new definition announced on January 11.  JA__-__[Doc. 1942829 at 90-91].  Thus, EPA's position threatens to impose retroactive liability on regulated parties who lacked fair notice of EPA's new requirements.  That violates the "fundamental principle in our legal system [] that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *Fox II*, 567 U.S. at 253.

Nor can EPA save its new requirements by seeking deference.  A court "may not defer to a new interpretation … that creates 'unfair surprise' to regulated parties."  *Kisor*, 139 S. Ct. at 2417-18.  "To defer to the agency's interpretation in this circumstance would seriously undermine the principle that agencies should provide regulated parties 'fair warning of the conduct a regulation prohibits or requires.'"  *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156

64

(2012).  Even agency silence can deprive a regulated industry of fair notice where, as here, the agency "never initiated any enforcement actions … or otherwise suggested that it thought the industry was acting unlawfully."  *Id.* at 157.  For all of the reasons explained above, EPA's about-face on January 11, 2022, deprived the industry of fair warning here.

## IV.    The Proper Remedy Is Vacatur

Because "EPA wholly failed" to comply with rulemaking procedures when taking binding action, vacatur is the only appropriate remedy.  *NRDC*, 955 F.3d at 85.  Under RCRA, an EPA requirement that was issued without notice and comment but purports to have the force of law "should be vacated on the merits because it *is* a final regulation but was promulgated in violation of the APA."  *Cement Kiln*, 493 F.3d at 226 (quotation marks omitted, emphasis in original).  "[T]he entire premise of notice-and-comment requirements is that an agency's decisionmaking may be affected by concerns aired by interested parties," and an agency's failure to begin that process *before* promulgating a legislative rule means no part of the rule should be allowed to stand.  *NRDC*, 955 F.3d at 85.

The "'normal[]'" practice of setting aside unlawful agency action also controls with respect to Petitioners' arbitrary-and-capricious challenges because EPA's "explanation of the basis and purpose of its rule is so inadequate that the reviewing court cannot evaluate it," *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d

193, 199 (D.C. Cir. 2009), and because EPA's actions conflict with the agency's prior positions and the evidence before the agency, *Battery Recyclers*, 208 F.3d at 1061-63.

This is not a case where setting aside unlawful action risks disruptive consequences. EPA's CCR regulatory scheme will remain in place, including its discretion to enforce the existing criteria, 42 U.S.C. §6945(d)(4)(A), (B), approve state plans, *id.* §6945(d)(1), and promulgate federal permit requirements, *id.* §6945(d)(2)(B). If EPA concludes that the requirements in the 2022 Rule are necessary additions to this regulatory scheme, it may attempt to issue them again in a procedurally valid manner that reflects reasoned decision-making. *See NRDC*, 955 F.3d at 85.

Accordingly, this Court should vacate EPA's new CCR requirements and thereby prevent EPA and State permitting authorities from taking further action to enforce them. *See Appalachian Power*, 208 F.3d at 1028 ("For the reasons stated, we find setting aside EPA's Guidance to be the appropriate remedy."); *Clean Air Project v. EPA*, 752 F.3d 999, 1003, 1011 (D.C. Cir. 2014) (vacating "Directive" issued to EPA Regional Air Directors); *CropLife*, 329 F.3d at 884-85 (vacating "the directive articulated in EPA's December 14, 2001 Press Release"); *Iowa League of Cities v. EPA*, 711 F.3d 844, 854 (8th Cir. 2013) (vacating "new regulatory requirements" in "two letters sent by the [EPA] to Senator Charles Grassley").

## **CONCLUSION**

The Court should grant the petitions and vacate the 2022 Rule.

Dated: December 6, 2022                    Respectfully submitted,

Joshua R. More                            s/ P. Stephen Gidiere III
ARENTFOX SCHIFF LLP                       P. Stephen Gidiere III
233 S. Wacker Dr., Ste. 7100              Julia B. Barber
Chicago, Illinois 60606                   BALCH & BINGHAM LLP
                                          1901 6th Ave. N., Ste. 1500
Helgi C. Walker                           Birmingham, Alabama 35203
David Fotouhi                             205-251-8100
GIBSON, DUNN & CRUTCHER LLP               sgidiere@balch.com
1050 Connecticut Ave., N.W.
Washington, D.C. 20036                    Stephanie Zapata Moore
                                          Executive Vice President & General
Michael L. Raiff                          Counsel
GIBSON, DUNN & CRUTCHER LLP               Daniel J. Kelly
2001 Ross Ave., Ste. 2100                 Senior Vice President & Deputy General
Dallas, Texas 75201                       Counsel
                                          David W. Mitchell
                                          Senior Counsel, Environmental
                                          VISTRA CORP.
                                          6555 Sierra Drive
                                          Irving, Texas 75039

                                          *Counsel for Petitioners Electric Energy,*
                                          *Inc., Luminant Generation Company LLC,*
                                          *Coleto Creek Power, LLC, Miami Fort*
                                          *Power Company LLC, Zimmer Power*
                                          *Company LLC, Dynegy Midwest*
                                          *Generation, LLC, Illinois Power*
                                          *Generating Company, Illinois Power*
                                          *Resources Generating, LLC, and Kincaid*
                                          *Generation, L.L.C.*

67

s/ Douglas Green
Douglas Green
Margaret K. Fawal
VENABLE LLP
600 Massachusetts Ave, NW
Washington, DC 20001
(202) 344-4483
dhgreen@venable.com
mkfawal@venable.com

*Counsel for Petitioner Utility Solid Waste
Activities Group*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel states that this document complies the Court's Order of October 5, 2022, because it contains 14,954 words, as counted by Microsoft Word, excluding the parts excluded by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1).  This document also complies with typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (6) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman font.

Dated: December 6, 2022

s/ P. Stephen Gidiere III
P. Stephen Gidiere III

69

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 6th day of December, 2022, a copy of the foregoing

document was served electronically through the Court's CM/ECF system on all

registered counsel.


Dated: December 6, 2022


s/ P. Stephen Gidiere III<br>
P. Stephen Gidiere III

70